## HOLWAY v. WORLD PUBLISHING CO.

No. 19691.   April 2, 1935.

As corrected May 27, 1935.

Aby & Tucker and Massingale & Duff, for plaintiff in error.

Breckinridge & Bostic, for defendant in error.

Joseph C. Stone, Charles A. Moon, Francis Stewart, and Samuel A. Boorstin, amici curiae.

BUSBY, J.   This is an appeal from a judgment of the district court of Tulsa county against the plaintiff in error, as plaintiff, and in favor of the defendant in error, the defendant therein.

The plaintiff, W. R. Holway, commenced this proceeding to recover from the defendant, World Publishing Company, general and exemplary damages for the injury alleged to have been sustained by him through the publication and distribution in the defendant's newspaper, the Tulsa Daily World, in five articles set forth in separate counts in the petition, to which the trial court sustained demurrers to the evidence as to counts 2, 4, and 5, and overruled the demurrers as to counts 1 and 3.   The plaintiff appealed from the judgment for the defendant on the two counts submitted to the jury and from the action of the court in sustaining the demurrers to the three counts.

In the defendant's answer, the publication of the articles was admitted, but denied that the articles were defamatory.   The de-

fendant pleaded the truth and claimed same to be privileged (1) because of public interest and open to discussion and criticism under the law, (2) that the plaintiff was a "public officer" under the statute and that the words were privileged so long as no crime was imputed, (3) that part of the publication constituted a fair and true report of proceedings authorized by law.

The record discloses that the plaintiff, W. R. Holway, was a civil and hydraulic engineer, living at Tulsa. The plaintiff and J. D. Trammell were employed under contract by the water commission of the city of Tulsa to make plans and specifications and to represent the city as supervising engineers of the water project begun by which the water supply of Tulsa was to be obtained from Spavinaw creek, some 50 or more miles away. Later Trammell retired and the plaintiff was put in full charge. Various contractors for various jobs and parts of the work had contracts with the city, all under the plaintiff's supervision.

The defendant, through its newspaper, the Tulsa Daily World, had taken a leading interest in the support of the Spavinaw project. When the plaintiff and Trammell submitted their joint estimate of the cost of the work, it was fixed at $6,800,000. Bonds for the project were voted and the work began. Sometime thereafter the plaintiff presented an estimate showing that $700,000 additional would be required. Later plaintiff presented an estimate showing $350,000 more would be required, which in all exceeded his original estimate by $1,500,000. It appears that the plaintiff failed in the completion of the project upon several dates set for the work to be completed. The water reached the city sometime in the latter part of 1924, but during the spring and summer of 1925 the city of Tulsa suffered a water shortage greatly to the disappointment and inconvenience of its citizens. The defendant paper frequently took to task both the water committee and the civil engineers, because of the extra unexpected cost and the delay, finally leading up to the articles published here complained of.

Owing to the number and length of the published articles complained of in the several counts of the petition, it will be impractical to set out the various articles in full, but we will quote the specific portions upon which the action was based. We will first consider the articles considered in the plaintiff's second, fourth, and fifth counts, which were withheld from the jury in sustaining the demurrers at the close of the plaintiff's evidence.

The article in the second cause of action:

"$880 for Wear and Tear. On that same day, W. R. Holway, who had been acting as consulting engineer, resigned his position. He had between the time the project was started and April 19, 1922, received in engineering fees the sum of $13,392.13, of which $880 was wear and tear on automobile. This bill was presented November 21, 1921, and was turned down by the board but was allowed December 12, 1921, the minute books of the water board containing the statement that the $880 item disallowed November 21 was 'depreciation on a Ford car'."

The article was supposed to include an excerpt of the minutes of the water board showing where certain money was paid to Holway. It stated:

"November 28, 1921, $509.21 and $348.11, but it is not shown for what Holway received that money, and there is also a note in the minute books that Holway appeared and explained the $880 automobile account disallowed November 21 was for 'depreciation on a Ford'."

The plaintiff's exhibit 8 is supposed to be a copy of the minutes of the water board or commission of November 2, 1921, when the account was presented and considered. The part pertaining to the Holway claim is in part as follows:

"Bills allowed: Mr. Holway, consulting engineer of the board, presented his final statement on work of preliminary survey of the Spavinaw project in the total amounting to $2,207, made up of the following items: * * *

"Salaries ----------------------$215.00
"Automobile account ------------ 880.00"

The minutes further showed that the accounts were allowed.

Plaintiff's exhibit 9 purports to consist of the minutes of the water commission on December 12, 1921. That part of the proceedings pertaining to the automobile account is as follows:

"Mr. W. R. Holway, consulting engineer of the water commission, appeared before the board to explain the amount of $880 presented in his last statement for work on the Spavinaw preliminary survey, being the amount charged to the water commission for depreciation on cars belonging to him, and used by his office in work on the preliminary survey.

"He explained that the Ford car, as set out in his original statement, was used three months with eight men in it, and that

the Dodge car people had set the depreciation on the Dodge car at $250, but that he actually sold it for more, so had allowed a lesser depreciation.

"Moved by McCullough, seconded by Avery, that the item charged for depreciation in the last statement of Mr. Holway's presented to the commission on November 21, 1921, being the final statement, the amount being $880, be allowed."

The exhibit further shows the $880 was allowed.

We shall endeavor to consider this published article in connection with the minutes of the water commission shown in the exhibits.

The plaintiff contends that the statement in the published article, that Mr. Holway presented a claim to the water commission for $880 for depreciation on a Ford car, while the evidence shown in the minutes of the water board covering this item showed the absolute falsity of the statement, when published of and concerning an engineer of high professional standing, amounts to libel per se. The plaintiff contends that Ford cars are so common and their price so well known to be less than $880, the published statement would indicate that Holway was charging the municipality for negligible services and drawing money from the public treasury which he was not justly entitled to, and that it would injure his standing and reputation as an engineer.

We are unable to see in what way the publication could be libelous per se and when construed in connection with plaintiff's exhibits 8 and 9 showing the minutes of the water commission. We cannot see how it could have been shown to be libelous had it gone to the consideration of the jury. It was shown by the record that the Ford car was used three months with eight men in it. It was not shown that the $880 was an unreasonable charge. It was the duty of the water commission to see that it was a proper charge. The price of the car was not shown nor the amount of the depreciation. It is but reasonable to assume that the reading public would take these matters into consideration. It is very evident that the plaintiff is placing an imaginary construction upon the words used in the publication and giving them a meaning which they do not convey. We do not think the publication was actionable per se. Under the decisions of this court, we do not think that there is a single element in the publication that would make it libelous per se. If in fact the article could be construed to

be libelous, but not libelous per se, no special damages being alleged, the demurrer to the evidence as to this cause of action was proper. Kee v. Armstrong, Byrd & Co., 75 Okla. 84, 182 P. 494; Thomas v. McShan, 99 Okla. 88, 225 P. 713; Oklahoma Publishing Co. v. Gray, 138 Okla. 71, 280 P. 419.

We will consider the published articles in causes 4 and 5 together. In article 4 the part complained of which has reference to the plaintiff follows:

"There was a reckless expenditure of the people's money for engineering purposes.

"Quite regardless of the engineer's contract, the water board evinced a disregard of ordinary business rules and professional practices almost unbelievable. Everyone knows quite well that an engineering fee is a percentage on actual construction alone. Thus in the Spavinaw case the engineering fee should have run on all construction parts of the enterprise and on nothing else.

"However, the record discloses that the generosity of the water board for Engineer Holway knew no bounds. He was paid his percentage on land costs, on legal fees, on litigation costs, on office salaries—even on his own commission! Had the water board been handling its own money—the private money of its members—such generosity would inspire no criticism. It would have a right to do as it pleased. But it was handling the money provided by the taxpayers of this city, and its generosity with other people's money contributed to running the cost of the enterprise from $6,800,000 to nearly $9,000,000!"

Article 5:

"Discovery that the engineering fees on the Spavinaw project were $359,000, and that Engineer Holway was paid his 4½ per cent. on even land purchases and office expenses, has caused a great deal of adverse comment. I am not surprised at that.

"It seems to me that if I should, as a private citizen, contract with an architect to construct me a house, he to receive a certain percentage of the total cost for supervision, that I would not for a moment entertain his demand, even should he make it, that I pay the per cent. on the cost of the lot and the expense of my own office. Yet that is exactly on all-fours with this water proposition.

"It would be interesting to know on what theory Holway claimed his percentage on the land purchases, and it would be more interesting to know how the water board managed to justify granting such a claim. It has been claimed by the water board that much of the excess cost of the project was due to land costs in excess of the original estimate. It is known that thousands of acres of land were purchased for the lake

site and shore-line protection. This had not one little thing to do with construction, and did not enter any of the contracts made anywhere. Much of it was acquired through court action, wherein expensive legal items were involved.

"The Tulsa public is mighty apt to view this particular phase of the Spavinaw enterprise with grave suspicion, and to question the patriotism of both Holway and the water board, even if an uglier impression does not prevail. It is certain that not a man on the water board would have tolerated such a thing had he been acting for himself and his own private fortune."

It is the plaintiff's contention that the published article in the fourth cause of action charges him with receiving illegal public moneys, and that it charges him with the violation of his contract, and definitely states that he received the money "quite regardless of the engineers' contract." It is further contended that every one knows that engineers are paid on a basis of commission on actual construction work, whereas in this case, Holway, in violation of his contract, charged a commission on land costs, on legal fees, on litigation costs and on office salaries, and even on his own salaries. That the article charges the engineer with grafting and practically charges him with entering into a conspiracy with the water commission, whereby the commission paid him and he received and kept moneys which were not provided for in his contract and to which he was not entitled.

We cannot agree with this contention. From the reading of the article, we think, when the article is viewed from the reader's standpoint, that it is but a reasonable interpretation to say that it would convey to the reader of the article that it was the water commission that the criticism was directed against. It would be easy to conclude that the criticism mainly was directed against the water commission for its extreme generosity toward Holway. It appears from the article that it was not Holway, but the water commission, that disregarded ordinary business rules and professional practices almost unbelievable. We do not think the article charges Holway, the plaintiff, with violating his contract, nor with the receiving of money illegally, but does charge extreme liberality on the part of the water commission toward Holway, and that it "evinced a disregard of ordinary business rules and professional practices unbelievable." We cannot see that the word "regardless," as there used, was intended to be used in a sense of violating rules of

proper construction. In other words, it meant, without considering the contract, or without regard to the contract, the water commission did these things. We are unable to see wherein the article charged Holway with anything he could not do legally. It was generally known throughout the city and county wherein the defendant's paper was circulated that the original purported cost of the Tulsa Spavinaw water enterprise or project was to be $6,800,000 and had been greatly increased in price both as to the construction and engineer's fees. If Holway was the recipient of the generosity of the water commission for services rendered beyond the original anticipated cost, and held by the water commission to be necessary, it would certainly be no crime on his part. The propriety of such acceptance by Holway is debatable and a matter of public concern. Furthermore, the record shows that there were other engineers connected with the project. The writer of the article was not hesitating to charge that the water project was costing much more than first estimated and expected.

In Bearce et al. v. Bass et al. (Me.) 34 Atl. 411, that court held:

"The character of the construction of such a building was a matter of public importance and interest to the inhabitants and taxpayers, and was therefore a matter of legitimate public discussion by the defendants, as well as all others who had, in common with the rest of the community, a public and a private pecuniary interest in this important public work.

"Every one has a right to comment on matters of public interest and concern, provided he does so fairly and with an honest purpose.

"Such comments or criticisms are not libelous, unless they are written maliciously, or there is averment and proof of special damage, or unless they go further, and attack the individual.

"There is a material difference between criticisms or attacks upon a public work and upon the individual. * * *

"So long as the criticism is confined to the work, and does not attack the moral character or professional integrity of the individual, and is fair and reasonable, it is not libelous, because it is no defamation of the individual. * * *

"In regard to matters of public interest, all that is necessary to render the words spoken or published privileged is that they should be communicated in good faith, without malice, to those who have an interest in the subject-matter to which they refer,

and in an honest belief that the communication is true, such being founded on reasonable and probable grounds."

We do not think the article shows to be libelous per se, and no special damages were alleged.

As to article number 5, it is contended that this article in charging that it would be interesting to know upon what theory Holway claimed his percentage on the land purchased, and it would be more interesting to know how the board managed to justify granting such a claim, and that these things did not enter into the contract anywhere, conveyed to the public the impression that the plaintiff was illegally collecting commissions on expenses which were entirely foreign to his engineering contract and not provided for therein. We are not able to agree that this article conveys that impression. If it was true that the engineer's fees were far in excess of what the people of Tulsa had a right to expect as compared with the first estimate of costs of the water project, it would be but natural that it would cause adverse comment and criticism. If Holway was paid 4½ per cent. on the land purchased in connection with the water project, and was furnished office expenses in addition to his other commission, there is nothing in the article that conveys the idea that Holway did not render services for any commission he might have received in connection with the purchase of the land. If in fact he received no such commission on land purchased, the article, standing alone, when taken in its plainest and most natural sense as it would likely and ordinarily be understood, charges Holway with nothing false or malicious, or anything that would expose him to public hatred, or that could injure him in his occupation.

In language too plain to be misunderstood or to need interpretation, this court has committed itself to the rule that if the published article complained of is not reasonably susceptible of defamatory meaning of itself or is not libelous per se, damage is not implied under the libel statute of this state (St. 1931, sec. 724 et seq.) and must be alleged.

This court, in the case of Fite v. Oklahoma Pub. Co., 146 Okla. 150, 293 P. 1073, held:

"It is contended by the plaintiff that there is no distinction in this state between articles libelous per se and articles that are not libelous per se, sometimes referred to as libelous per quod. We do not agree with that contention. The cases hereinbefore cited show that that distinction has long been recognized by this court. It was recognized in N. S. Sherman Machine Co. v. Dunn, 28 Okla. 447, 114 P. 617, and was again followed in Hargrove v. Oklahoma Press Publishing Co., 130 Okla. 76, 265 P. 635. It was therein stated to be as follows: 'No special damages are alleged. Therefore, if said publication is not libelous per se, the action of the trial court in sustaining the demurrer to the plaintiff's petition was proper. Matthews v. Oklahoma Publishing Co., 103 Okla. 40, 219 P. 947; M., K. & T. Ry. Co. v. Watkins, 77 Okla. 270, 188 P. 99; Kee v. Armstrong, Byrd & Co., 75 Okla. 84, 182 P. 494.' "

When special damage is not alleged in such cases the court is justified in sustaining a demurrer to the declaration. Fite v. Oklahoma Pub. Co., supra. It is the duty of the court to determine whether or not the language used can be fairly and reasonably construed to have such meaning. Matthews v. Oklahoma Pub. Co., 103 Okla. 40, 219 P. 947.

In Hargrove v. Oklahoma Press Publishing Co., 130 Okla. 76, 265 P. 635, this court held:

"Where, in an action for libel, no special damages are alleged, a demurrer interposed to the petition should be sustained by the court, unless the publication complained of is libelous per se. * * *

"Where a demurrer is interposed by the defendant to the petition of plaintiff, the demurrer only admits the truth of the facts pleaded, but does not admit the truth of the inference of the pleader based on the facts pleaded, unless the facts themselves are sufficient to authorize such inference"

—and said:

"As to whether the article herein is libelous per se, we must consider in our determination only the thought, idea, impression, or opinion conveyed to the reader of the same. If the article, when so considered, engenders in the mind of the reader a conclusion, impression, or opinion of the plaintiff that is defamatory, and as such tends to expose plaintiff to public hatred, contempt, obloquy, it is libelous per se. Bratcher v. Gernert, 77 Okla. 12, 185 P. 1081; Phoenix Printing Co. v. Robertson, 80 Okla. 191, 195 P. 487; Wiley v. Oklahoma Press Publishing Co., 106 Okla. 52, 233 P. 224; Stevens v. Snow (Cal.) 214 P. 968; Choctaw Coal & Mining Co. v. Lillich (Ala.) 86 So. 383; Jones v. Greeley (Fla.) 6 So. 448.

"The publication cannot be measured by its effect when subjected to the critical analysis of a legal mind; it must be measured by its natural and probable effect upon the mind of the average lay reader."

Relative to the published article being actionable per se, the plaintiff stated in his brief:

"We do not contend that the petition states a cause of action for special damages. We rely on the petition stating a cause of action in each of the counts on the theory of libel per se."

We think the trial court rightfully concluded that the published articles here considered were not libelous per se, and there being no special damages alleged, the court committed no error in sustaining the demurrer to the evidence. Hargrove v. Oklahoma Press Pub. Co., supra; Fite v. Oklahoma Publishing Co., supra; Wimmer v. Oklahoma Publishing Co., 151 Okla. 123, 1 P. (2d) 671.

The particular parts of the alleged injurious publications shown in the first and third causes of action, which were submitted to the jury, are not set out in the discussion of these articles in the plaintiff's brief. The substance of the first article asserted that the $8,000,000 plant failed to function and that the city was threatened with a serious water famine; that the best the gentlemen in charge can offer is the re-employment of the same engineer who has convinced the Tulsa public that he cannot figure accurately either as to the time limit in which a job can be completed or the cost of that job; that the Tulsa citizens, without casting any aspersion on W. R. Holway, engineer, feel that the time has come when older and abler counsel should be employed. The article stated:

"It is clearly evident that the existing water officials, from board members to water commissioners and engineer and back again, are simply rotating in circles. Since Colonel Trammell, the originator of the Spavinaw gravity scheme, and the senior consulting engineer on the job, for some unexplained reason found it incompatible with his interest or self-respect to continue in that capacity, Engineer Holway and the consulting engineer, one Maury, have had affairs in their own hands. It was after Trammell left the work that the cost began to mount. It was after Trammell was no longer connected with the construction of his own plans that very suddenly the water board and water commissioner and water engineer found it would require $700,000 additional to complete Spavinaw, and it was after Trammell had left that a few weeks later the same officials found it would require $350,000 more to complete Spavinaw. * * *

"This paper has no interest in Colonel Trammell. It has no interest in the masterful egotism and absurd pride of either commissioner Rudd or Engineer Holway. It is not even prepared to say that Engineer Holway is incapable of meeting the issues presented. * * * The Tulsa citizens, without casting any aspersion on W. R. Holway, engineer, feel the time has come when older and abler counsel should be employed."

The publication shown in the third cause of action presented to the jury which has particular reference to the plaintiff is in part as follows:

"Spavinaw fees were overpaid audit reveals. Engineers got commissions on all angles of new water system. $15,000 too much. $352,430 paid in fees whereas but $337,500 should have been distributed here. Engineering fees paid to Trammell & Holway, W. R. Holway Engineering Company, Dabney H. Maury and George W. Goethals Company on the Spavinaw project were paid, not only on actual construction costs, but also on the purchase of lands, office salaries, court costs, field salaries, general expenses and attorneys' fees between May, 1922, and November, 1924, according to figures from the records of the water commission."

This published statement appears from a part of the article to have been taken from facts shown by the engineer's contract, the Boydston audit, and the minutes of the water commission. The article undertook to show what the engineers' fees were and what they should have been, and alleging, in substance, that under the original contract of Trammell & Holway, the engineers' fees would be $318,920.45 for the complete job, outside of the $500,000 bond issued tied up in court, but that the Boydston audit shows that the four engineering concerns actually received up to November 12, 1924, $352,430.62.

The plaintiff's assignment of error 4 relates to error in giving instructions to the jury. We will discuss only the instructions discussed in the plaintiff's brief. Instruction No. 5 complained of follows:

"You are instructed that each of the articles for your determination published by the defendant, is concerning a public servant, and a matter of public interest; and that comment and criticism of a public servant and on a matter of public interest are privileged unless the facts (as distinguished from the comment and criticism) published are untrue, or the comment and criticism on the facts are unfair, or inspired and published by actual malice."

It is contended that this instruction gave to the jury a misconception of the rights of the plaintiff and misconstrued the law: that it gave the jury the impression that Holway

was occupying the position of a public officer and that the publications were privileged. We do not think that the instruction conveys any such misconception of the plaintiff's rights. The instruction is short and specifically sets out that the publication would not be privileged if the facts published are untrue, or the comment and criticism on the facts are unfair, or inspired and published by actual malice. These were the questions for the jury to determine. The instruction does not convey the idea that Holway was a public officer. The entire trial proceedings were before the jury, and they knew he was not a publicly elected officer, but an employed engineer. An elected officer may be a public servant, but a public servant is not necessarily a public or elected officer.

We quote from Corpus Juris, vol. 50, page 862, section 76:

"Public Servant. There are two classes of public servants, officers, or those whose functions appertain to the administration of government; and employees, or those whose employment is merely contracted."

We think the plaintiff's contention that he was prejudiced by the 5th instruction is entirely without merit.

In instruction No. 10, upon which the plaintiff predicates error, the jury were instructed that the article sued upon is privileged in so far as they might find it is a fair and true report of any proceeding authorized by law, such as the minutes of the water board are, and any and all expressions of opinion in regard thereto, and criticism thereon. That the article is privileged in so far as the jury may find that it is a fair and true report, or expression of opinion, criticism of, or comment upon, a public record and proceeding authorized by law such as the Boydston audit was. But the defendant was not privileged to make false or distorted statements as to what the reports showed, and that if the defendant did make such distorted statements about what the record showed, it was not privileged; that the burden of proving by a preponderance of the evidence that the article was privileged was on the defendant.

The principal objection directed against the instruction is that it attempts to show the Boydston audit of the water commission to be a public record. It is contended that it was not a proceeding authorized by law, since it was not made by a public auditor authorized to make same and would not therefore be a public record.

The publication is directed against the water commissioners and incidentally against the engineers as their acts are reflected in the minutes of the water commission. It is not contended that the articles impute crime or that they were not comments on matters of public interest. Neither has the plaintiff attempted to show that Boydston audit misrepresented the minutes. The comment had reference to the minutes as well as the audit of same. Privileged communications, by the provisions of section 726, O. S. 1931, include:

"Third. By a fair and true report of any legislative or judicial or other proceeding authorized by law, * * * and criticisms thereon, and any and all criticisms upon the official acts of any and all public officers, except where the matter stated of and concerning the official act done, or of the officer, falsely imputes crime to the officer so criticised."

Those communications in which the circumstances of the defamatory publication, together with the testimony, rebut the presumption of malice and afford a qualified privilege are privileged publications. German-American Ins. Co. v. Huntley et al., 62 Okla. 39, 161 P. 815.

It certainly cannot be contended that the minutes of a municipal body and the proper audits of same kept as a record are not acts of public officers and proceedings authorized by law, even though not required by law. We think the contention directed against this instruction is purely technical and without merit.

The other instruction assigned as error is No. 16. Two objections are urged against this instruction. It advised the jury that in arriving at the amount of damages, if any, as well as the malice or good faith of the defendant in publishing the article, they might take into consideration the entire article sued upon as well as others upon which suit was not instituted but were admitted in evidence at the trial of the cause. We do not think it can be successfully contended that the defendant may not lessen the damages which the plaintiff is seeking by showing facts by putting into the evidence other articles published on the same subject-matter, outside of those claimed by the plaintiff to have been injurious to him. The authorities cited by the plaintiff do not hold to the contrary. In Wiley v. Oklahoma Press Pub. Co., 106 Okla. 52, 233 P. 224, cited by plaintiff, this court said:

"In determining whether the article is libelous per se, the article alone must be construed, stripped of all insinuations, in-

nuendo, colloquium and explanatory circumstances. * * *"

In the instant case the published article was not being construed for the purpose of determining whether or not it was libelous per se. The determination of that fact was not left to the jury. That was a legal question and had been determined by the court. It was for the jury to determine if the articles were privileged and how much damages the articles caused the plaintiff, if any, if not privileged. The other publications were not introduced to show whether or not the articles sued on were libelous per se, but purely to mitigate damages. We think when the instructions complained of are construed as a whole, they are free from the objections contended for, and especially so since the jury failed to find any damages whatever in favor of the plaintiff.

Considering the instructions as a whole, we think the jury were properly instructed upon all the issues presented and that the court committed no error in refusing to give the requested instructions.

A comprehensive review of the previous decisions of this court dealing with the subject of libel and slander impresses upon us that it has long been the law of this state that matters of public interest are legitimate subjects of fair comment and honest criticism. Such comment and criticism, no matter how severe its terms may be, is not libelous, unless it is written maliciously. Private individuals who claim the confidence of the public and seek the possession of public funds are subject to a fair bona fide criticism. Such criticism offers a measure of public security and should be encouraged, not suppressed. A continued recognition of these principles is essential to the maintenance and preservation of the "freedom of the press" as an American institution.

Finding no error in the judgment of the trial court, the same is affirmed.

McNEILL, C. J., OSBORN, V. C. J., and RILEY, BAYLESS, WELCH, PHELPS, CORN, and GIBSON, JJ., concur.