[Civ. No. 9677. First Appellate District, Division One.—July 21, 1936.]

GEORGE G. McLAUGHLIN, Respondent, v. STANDARD ACCIDENT INSURANCE COMPANY (a Corporation) et al., Appellants.

Myrick, Deering & Scott for Appellants.

Paul C. Dana, Jordan L. Martinelli and Eldon B. Spofford for Respondent.

THE COURT.—The plaintiff brought the present action to recover from the Standard Accident Insurance Company, a corporation having its principal office in the city of Detroit, Michigan, and L. R. Travis, the general manager of its San Francisco office, the sum of $20,000 damages for libel. The cause was tried before a jury. At the conclusion of the plaintiff's case the defendants moved the court for a nonsuit, which was denied; and before the submission of the cause to the jury they moved for a directed verdict, which also was denied. The jury thereafter rendered a verdict in plaintiff's favor for $5,000, upon which the defendants moved for judgment in their favor notwithstanding the verdict, and in the alternative for a new trial, which being denied, judgment was entered in accordance with the verdict.

The defendants have appealed, and here contend that their general demurrer interposed to the first amended complaint should have been sustained; that error was committed by the trial court in denying each of said motions, and that the evidence is insufficient to sustain the verdict.

As we think that the appellants' contention with respect to the evidence must be sustained, we refrain from considering and passing upon the point of touching the sufficiency of the pleading.

The plaintiff in the month of May, 1932, had been for some sixteen years employed by the Standard Accident Insurance Company (which we shall hereinafter designate as the defendant). Included in his duties were those of soliciting accident, health and other policies of insurance, collecting premiums thereon and remitting the money so collected to the company at its San Francisco office, the territory in which he operated being in and around San Rafael in the county of Marin. In said month of May he had fallen behind in these payments;

and being unable when called upon by the company to pay the amount claimed to be due, the matter was reported by it to the Fidelity and Deposit Company of Maryland, as was required by the terms of a surety bond executed by the plaintiff and that company for the faithful performance of plaintiff's duties as such agent. Plaintiff's connection with the defendant was terminated, and one C. D. Pierce was appointed defendant's agent for the territory theretofore served by the plaintiff. At the same time, to-wit, on May 23, 1932, plaintiff entered into a contract with Pierce by which he transferred to him the goodwill of his accident and health insurance soliciting business in consideration of Pierce undertaking to collect premiums on the first year renewals of policies theretofore written by the plaintiff for the defendant, and to devote the commission on such premiums to the satisfaction of plaintiff's aforesaid shortage, the balance, if any, after such satisfaction to be paid to plaintiff.

The complaint charges that in consideration of the making of this contract by him with Pierce the defendant relinquished all its claims against him arising out of said shortage, and then proceeds to state that on May 24, 1932, the defendant L. R. Travis, acting as manager of said defendant company and within the scope of his authority, addressed a letter to one C. F. Reindollar, who was at said time a client of plaintiff and a person to whom plantiff had sold a policy of insurance for said defendant, and from whom plaintiff had collected the sum of $92.50 as a premium thereon, and which was the basis of one of the claims so relinquished by defendant to plaintiff as aforesaid.

The said letter was in the following terms:
"Dear Sir:

"Re: 312800—C. F. Reindollar.

"Please be advised that Mr. G. G. McLaughlin of San Rafael has just made arrangements with Pierce Insurance Agency of San Anselmo, California, to handle his insurance business. Mr. McLaughlin will still be interested in the business but please understand that all premiums on policies must in all cases be paid direct to Pierce Insurance Agency and not to Mr. McLaughlin.

"We thank you for past favors and hope for a continuance of same, and wish to assure you that we will at all times be interested in giving you the best service possible.

"Our books show that there is an unpaid premium due us of $92.50 on Accident and Health policy dated January 5, 1932. If there is any discrepancy in this please advise us immediately.

"Yours very truly,

"L. R. TRAVIS, Manager."

The complaint then charges that exact duplicates of this letter, with the exception that the unpaid premium was in a different amount, were at the same time sent by defendant to thirty-three other holders of policies in the defendant company, clients of plaintiff; that each and all of them, including Mr. Reindollar, had paid to plaintiff the premium specified in said respective letters, and that he in turn had accounted to defendant for each and every of said premiums; and further alleges "That the said defendant, L. R. Travis, as manager meant thereby that the persons to whom said letters were addressed had paid said premiums to plaintiff; that said plaintiff had not accounted to said defendant Standard Accident Insurance Company for said premiums so paid; that said plaintiff was guilty of the crime of embezzlement in the case of each person to whom said letters were addressed of the sum specified therein as an unpaid premium; that no further premium, therefore, should be paid to plaintiff. That said publication was false and defamatory and was made maliciously and with knowledge of its falseness."

There are other allegations, which relate to damage suffered by the plaintiff in his reputation and business as the consequence of the writing of these letters.

At the trial plaintiff testified that he became an agent for the defendant in August, 1936, and that he at that time entered into a written agreement with the defendant with respect to such agency. The agreement was thereupon introduced in evidence. It was executed on behalf of the defendant by its president and secretary, and among other provisions contains the following:

"Reports and Collections.

"6. Said agent shall make monthly remittances in time to reach the Home Office of the company at Detroit, Mich., not later than the fifteenth day of each and every month. Such remittances shall cover premiums on all annual policies written sixty days prior to the date of remittance, and premiums for all quarterly, semi-annual or short term policies

written subsequent to the date of last remittance, and also all premiums collected to date of remittance irrespective of date of policy.

"The company agrees to allow said agent credit for full returned premium on annual, semi-annual or quarterly policies, or renewals thereof, upon which the agent is unable to collect any portion of the premium, provided said policies or renewals are returned to the Home Office of the Company within 60 days of the date of issuance in cases of annual policies, or within 30 days from the date of issuance of quarterly or semi-annual policies. Where the policies or renewals have not been returned within the time above prescribed said agent shall be personally liable for the payment of the *pro rata* earned premium from the date of the policy to the date of such return. . . .

"It is mutually understood and agreed that all premiums paid to the agent on policies issued shall be considered the property of the company, and that the commission which the company agrees to pay said agent shall be considered a debt due by the company to the agent, and shall not be construed in any way as giving rise to a lien or claim on the company, and the agreement on the part of the company to allow the agent to deduct commissions from premiums collected shall in no sense be construed as a waiver of the rights of the company to the ownership of said premiums."

Having introduced this agreement the plaintiff, being then on the witness stand, was asked this question: "After entering into and signing this agreement did you have thereafter a conversation with Mr. C. F. Briggs of the Standard Accident Insurance Co. in San Francisco." This question being objected to, counsel for plaintiff stated that it was preliminary and that he would show an oral agreement executed by both parties which was in force and effect at the time the trouble here involved developed. The objection was thereupon overruled, and the witness answered that he had such a conversation about two weeks after the execution of said written agreement, and that Mr. Briggs at that time occupied the same position as did Mr. Travis at and prior to the time of the trial, i. e., manager of the San Francisco office of the defendants. He was then asked: "Did you have a conversation with Mr. Briggs about remittances for premiums collected by yourself to the Standard Accident Co.?" This question

was objected to as incompetent, irrelevant and immaterial "and as tending to modify or alter the terms of a written agreement". This objection was overruled upon plaintiff's counsel again stating that he would show an executed parol agreement, and the witness then testified: "I did. I told Mr. Briggs that I had been used heretofore to working on a salary and I wanted something to live on, and he said to me, · he said, 'Mr. McLaughlin, you are the first real agent that we have in Marin county.' He also said to me, he said, 'I have looked up your references. Your references are very fine, and we will extend you credit and work with you.' I said 'I have nothing to live on,' and he suggested to me that by my engaging in the casualty insurance business I was entering a business like any merchant for himself, that would have a potential value and would mean something to me in later years, and he advised me to open a commercial account and deposit my premiums, and they looked to me to pay for those premiums and not the client; and that I would be billed for those premiums—I would be billed for those premiums at regular stated intervals; and I was allowed up to ninety days on an annual and sixty days on a semi-annual and quarterly. I agreed to it and kept it going many years. Thereafter, pursuant to said agreement, I opened up a commercial account. . . . I put the premiums I collected after this conversation in that commercial account. Thereafter I made payments to the Standard Accident Co. for premiums previously collected by my personal checks to the company at all times. This was the method of payment I adopted immediately after this conversation with Mr. Briggs and the method of payment which I was using at the time that trouble developed in May of 1932. . . . After that time I did not have any conversation with Mr. Travis regarding my manner of making payments. Mr. Travis at the time I entered into this contract and had the conversation with Mr. Briggs was connected with the Standard Accident as cashier."

The plaintiff also testified that on one occasion during his sixteen years' service with the defendant a person to whom he had sold a policy asked Mr. Travis, who was then cashier, if he should pay the premium direct to the company, and that Mr. Travis replied: "No, pay it to Mr. McLaughlin and he will take care of it in that way," and that defendant would look to McLaughlin for payment. This particular testimony

was admitted over defendant's objection that it was incompetent, irrelevant and immaterial, that no authority was shown in Mr. Travis at the time in question, and was an attempt to vary a written contract, and upon assurance by plaintiff's counsel that Mr. Travis' authority would later be shown.

 In attempted proof of the claimed oral modification of his written contract the plaintiff introduced a number of monthly statements rendered by him. These merely showed certain policies, their date and the premium payable on each, the aggregate of which he paid by check at the time of rendering the statement. No reasonable inference could be drawn from these statements that they were rendered in execution of the parol agreement. They reflect more nearly an attempted compliance with the written contract with, it is true, a certain tardiness on the part of plaintiff in making collections or in paying them over, acquiesced in by the local manager of the defendant; but it also appears from the record uncontradicted that the first actual knowledge that the local officers of the defendant company had that the plaintiff was not including in his monthly settlements all premiums collected up to the date thereof was in May, 1932, upon the occasion of a visit which he made to the defendant's San Francisco office. It then developed that he had collected premiums which, after deduction of his commission, left due to the defendant, under the terms of the written contract the sum of $766, and he disclosed to the manager that he was unable to pay this amount. The manager insisted that he find the money at once or it would be necessary to resort to his bondsman. At this juncture the plaintiff made no claim that his written contract had been changed or that the amount demanded was not due. He begged for time to find the money, and even wrote a letter to the vice-president of the company at Detroit—with whom he was on friendly terms—urging that in recognition of his long service with the company he be accorded a bonus of $1,000 and thus be enabled to pay the amount claimed by the defendant to be due.

The parties are not in accord as to the effect of the purported parol modification upon the written contract, but it is not necessary, we think, to determine this precisely, and for several reasons: First, there was no proof of any authority on the part of the local manager of the defendant to change

the written contract. On the contrary, it was testified on behalf of the defendant that he had no such authority, and this was confirmed by the testimony of the plaintiff himself; second, subsequent to the making of the parol agreement the written contract was twice affirmed in writing (with certain changes in rates of commission not here involved), the first time on June 20, 1922, and again on April 24, 1930. At these several times no reservation was made in plaintiff's favor of the modification claimed by him to have been formerly granted; and, indeed, the propriety thereof was no longer apparent since he was not now a novice starting his first venture, who needed encouragement and perhaps some indulgence, but for years past had been active and successful in the business; third, even under the plaintiff's construction of his contract he admitted that there was at least $300 due from him in premiums collected, and he knowingly allowed defendant to include this amount in its claim on his bondsman without disclosing to the officers of the defendant that at that very time he had in his bank account money to this amount, and which he afterwards used for his own purposes. As to this the question was put to him by defendant's counsel: "Why didn't you pay the $300 and avoid all this discussion?" and he replied that if he had done so he would have "stripped himself clean". It may be added that the plaintiff also admitted that even this bank balance was partly composed of premiums he had collected on policies issued by other insurance companies, to which he was also indebted.

If, as we have shown, the published statement of which the plaintiff complains as interpreted by the innuendo set forth in the complaint, was true he was not entitled to recover damages. "The truth of the accusation is a complete bar to the action; an absolute, entire defense." (Seelman, Law of Libel and Slander, p. 146; Folkard's Law of Slander and Libel, 7th ed., p. 303.)

■ It is next urged by plaintiff that the defendant had prior to the publication of the alleged libel released him from all liability on account of the shortage.

In this connection it appears without conflict in the evidence that the defendant having reported the shortage to plaintiff's bondsman, the Fidelity and Deposit Company of Maryland, and the plaintiff's employment as agent of the defendant ended, the plaintiff announced his intention to find

a buyer for the good will of the business he was then relinquishing. Since any purchaser of this good will could only derive benefit from it by being accepted by the defendant as its agent in the territory theretofore served by plaintiff, Mr. Travis impressed upon plaintiff that any buyer must be acceptable to the company; and the plaintiff not having a buyer ready at hand, he suggested to him one C. L. Pierce, who was already agent for the defendant in contiguous territory. After some urging and insistence by Travis, the plaintiff agreed, and there was drawn up a contract between plaintiff and Pierce by which the former was to turn over to the latter a list of persons holding policies in defendant company theretofore procured by plaintiff, Pierce was to collect the renewal premiums on any such as should be continued beyond their present term, and pay the commission earned on first-year renewals to the Fidelity and Deposit Company up to the amount that it should pay to the defendant company on account of its liability under plaintiff's bond, and the excess, if any, to the plaintiff.

Regarding the making of this contract the plaintiff testified: "And Mr. Travis made the proposal that I would turn over my entire business to Mr. Pierce and I was to get the first year's full renewals—which is the minimum on my business—less the amount of indebtedness . . . and my slate would be wiped clean by transferring it to Mr. Pierce. After I made half a dozen refusals, finally I said 'All right, I will accept the offer of Pierce.' Mr. Travis said 'You transfer your business to Pierce, and you will get the benefit of a whole year's full renewals less this indebtedness.'" The plaintiff's son corroborated this testimony.

It is the plaintiff's contention that the expression attributed to Travis that the plaintiff's "slate would be wiped clean" by transferring the business to Pierce meant that by the mere entering into the contract plaintiff's indebtedness would be discharged *instanter*.

In view of the admitted circumstances of the transaction—with which the plaintiff was wholly familiar—no such inference can be reasonably drawn from this or similar expressions.

The plaintiff knew that his shortage had been reported to the bonding company and that the bonding company had admitted the claim subject to due proofs of loss. He knew that by payment to the defendant of the amount of this loss

the bonding company would be subrogated to defendant's rights against him to recover the amount of his shortage. He knew that the bonding company intended to avail itself of this right since in the negotiation with Pierce for the transfer of the good will of his agency he had accompanied an attorney in the employ of the defendant—and who drew up the contract between plaintiff and Pierce—to the office of the bonding company for the purpose of obtaining, and did obtain, that company's consent, given through its manager, to the execution of that contract. He consequently knew that the only person who could release him from his indebtedness was the bonding company; and he also knew that the only interest which the defendant had in his contract with Pierce was to have as its agent in plaintiff's former territory a person satisfactory to it, and had designated Pierce as such person.

It is of course apparent that if the contract with Pierce had been duly performed, and if the commissions on first year renewal premiums collected by Pierce and paid to the bonding company had been sufficient to indemnify the latter for its loss incurred on plaintiff's bond, his indebtedness would in this manner have been discharged,—his "slate wiped clean". But that result was not reached by the mere signing of the contract, and no intelligent person could have deduced such a meaning from the words used by Travis under the known and admitted circumstances. It may be added that the plaintiff in this contract undertook to render Pierce all reasonable assistance in its execution; and it was testified by Pierce that this undertaking was disregarded, and that owing to the attitude adopted toward him by the plaintiff and to the plaintiff's activities he abandoned the contract before collecting sufficient premiums the commission on which would indemnify the bonding company. It may here not be inappropriate to say that even the restoration of money or property embezzled does not change the fact of embezzlement, although in a criminal prosecution therefor such restoration may be considered in mitigation of punishment. (Pen. Code, sec. 513.)

In view of our conclusion that the statement made by defendants to the various persons holding policies in the Standard Accident Insurance Company, even if given the meaning attributed to it by plaintiff, was true, it is not neces-

sary to consider at length the further contention of defendants that even if untrue, it was a privileged communication made without malice. In this behalf it is sufficient to say that not only does the evidence show it to have been true, but also that it was made under circumstances entitling it to be regarded as privileged, and the implied finding from the verdict that it was made maliciously is not sustained by the evidence.

It follows that the trial court erred in denying the motion of defendant for judgment notwithstanding the verdict. The judgment is therefore reversed, and the cause remanded to the superior court with direction to enter judgment in favor of the defendants.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 17, 1936.