THE STATE PRESS COMPANY, INC., v. WILLETT.

4-9640                                    245 S. W. 2d 403

Opinion delivered January 21, 1952.

Rehearing denied February 18, 1952.

*J. R. Booker* and *John A. Hibbler,* for appellant.

*Kenneth C. Coffelt* and *Frances D. Holtzendorff,* for appellee.

GEORGE ROSE SMITH, J. The appellee, a clergyman, brought this libel suit against the appellant, a newspaper publisher. Upon this appeal the main question is whether the trial judge was justified in giving what amounted to a peremptory instruction for the plaintiff upon the issue of the defendant's liability for compensatory damages. The court also told the jury that the plaintiff was entitled to punitive damages if the libelous matter was published with actual malice. The jury returned a verdict for $100 compensatory damages and $1,400 punitive damages, and a judgment was entered upon the verdict.

The plaintiff is a Negro clergyman who was formerly the pastor of a church in Little Rock. For some years before the alleged libel was published the plaintiff had been conducting weekly radio programs which originated in his church and were paid for by various sponsors. Other Negro ministers became dissatisfied with the tenor of the sermons broadcast by the plaintiff on his programs, and complaints were made to the editor of the defendant's newspaper. This paper is read principally by Negroes. On February 24, 1950, the paper published the article now complained of, which read in part:

"It Stinks to the High Heavens

"The odor from a cesspool that has been exposed to the sun from the morning of creation down to the present moment could not be any more offensive to the sense of smell than the Reverend M. D. Willett's radio program that takes to the air every Sunday night by remote control from St. Paul church.

"The Willett ranting has become so nauseating that it doesn't only affect the sense of hearing, but every sense known to the human being.

852

"We are cognizant of the fact that it is our privilege, thus far, to listen to the program or not listen to it. But, on the other hand, a program of this kind that is so detrimental to the welfare of the race cannot be ignored. We further agree, that criticism of the parson's program will in no way change him from his routine of ranting. Trying to improve his conduct over air would be like administering medicine to the dead. This criticism will only add to his listeners and give more people a chance to see how ridiculous he is.

"However, Willett is not to be censured too much, for he is like most parasites, distinguished from the most venomous reptile by his ability to walk. His white supporters are more or less the ones to be censured. They show very poor judgment in their selection of Willett's type to vilify the Negro. There are many men known to the white man, and the Negro, who will vilify the Negro for a price with a certain amount of dignity.

\* \* \*

"Every Negro who advocates decency should protest to the radio station he comes over, and to the white people who are supporting his program on the air and let them know how the Negro resents the doctrine and idiotic clowning of the Reverend Mister M. D. Willett."

After the publication of this article the plaintiff brought the present suit. His proof tended to show that as a result of the article he had been shunned by other Negroes, his church membership had declined from about three hundred to fifteen, and the sponsors of his programs had withdrawn their support. The defendant admits the publication, but its contention is that since Willett's programs were a matter of public interest the editor's comments were privileged under the doctrine of fair comment. On this theory the appellant argues that the court's first instruction was erroneous in that it disregarded the defense that was offered. This is the instruction: "You are instructed that the article published by the defendant on February 12, 1950, and set out in the complaint, is actionable in itself, that it was not privileged, and the plaintiff is entitled to recover such

compensatory damages as will fully and adequately compensate him by reason of the publication of the defamatory article, not in excess of the amount sued for.''

A similar instruction was approved in *Murray* v. *Galbraith,* 95 Ark. 199, 128 S. W. 1047, and in the case at bar the instruction was correctly given. The gist of the defendant's article is that Willett accepted money in return for maligning his own people. This charge implies a want of honesty, is necessarily injurious to a clergyman in his profession, and is therefore actionable *per se*. *Studdard* v. *Trucks,* 31 Ark. 726; Rest., Torts, § 569, Comment *g*. Nor was the matter privileged under the rule of fair comment. Under this doctrine the statements would have been privileged had the charge been true and had the comment been made without malice. Rest., § 606. But the defendant made no attempt to prove any arrangement between Willett and his sponsors, by which he was to be paid to vilify his race. The doctrine of fair comment does not permit a newspaper to publish false and libelous statements even though a matter of public concern is involved. And the jury found by its verdict for punitive damages that the publication was motivated by actual malice, which also makes the doctrine inapplicable.

It is also contended that the punitive damages are excessive, but this is largely a matter for the jury's determination, and we think the evidence sufficient to support the jury's conclusion.

Affirmed.