[L. A. No. 25843. In Bank. Sept. 16, 1960.]

SAMUEL MAIDMAN, Appellant, v. JEWISH PUBLICATIONS, INC. (a Corporation) et al., Respondents.

644

Samuel Maidman, in pro. per., for Appellant.

David H. Paltun for Respondents.

PETERS, J.—Plaintiff appeals from a judgment of dismissal entered after defendants' special and general demurrers to the third amended complaint for libel were sustained without leave to amend. The sole issue presented by this appeal is whether plaintiff's complaint states a cause of action for libel against defendants. It does.

Plaintiff's action is based upon an editorial which appeared in the November, 1957, issue of the B'nai B'rith Messenger, a weekly Anglo-Jewish newspaper published in Los Angeles County and circulated principally within that county by defendant Jewish Publications, Inc. The Messenger was not connected with the B'nai B'rith organization. The editorial commented upon certain statements made by Maidman as an attorney during the course of a trial in the Los Angeles Superior Court, in which Maidman was representing the plaintiff in that action. The editorial was written by defendant Cummins, who is the editor and individual publisher of the Messenger. The other personal defendants are the associate editor and the general manager of the Messenger.

The editorial read as follows:

"An 'Important' Ben B'rith Interprets Rosh Hashanah

"A trial was in progress in the Superior Court of the State of California, Department 5, in Glendale—before the Honorable Judge Roger A. Pfaff, entitled Frazier v. Pass. A Gentile attorney was representing two Jewish defendants, and a Gentile plaintiff was represented by attorney Samuel Maidman who is the 'Chairman of the Administrative Board of the B'nai B'rith Record,' the house organ of the Southern California Council of B'nai B'rith Lodges.

"The Gentile attorney, out of respect for his two Jewish clients, asked Judge Pfaff if he could have a continuance for his Jewish clients inasmuch as 'tomorrow' was a Jewish holiday, Rosh Hashanah, and that his clients would like to observe the Jewish holiday.

"Judge Pfaff, knowing that Samuel Maidman is Jewish, asked Mr. Maidman if he had any objections. Whereupon Mr. Samuel Maidman, 'Chairman of the Administrative Committee of the B'nai B'rith Record,' gave the Court this 'profound' and 'learned' discourse on the meaning and value of Rosh Hashanah.

"The following quotations are word for word from the Reporter's Transcript:

" 'I have that same problem but out of the good book there is a provision which says on a joyous holiday such as a new year people may do a duty, and not do penance. The holiday where I think it is generally observed that we don't observe our daily habits is—so far as duties are concerned—is Yom Kippur, which is the holiday next week, so if I can serve my client I have a duty which I think the good Lord . . .'

"Then Mr. Maidman let the Court and all of his auditors

know that he ought to know something about this matter of the proper observance of Rosh Hashanah since he is the Chairman of the Administrative Board of the B'nai B'rith Record, which is tantamount to 'publisher.'

"After Mr. Maidman's profound interpretation, *i.e.* that Rosh Hashanah is a 'joyous holiday,' Judge Pfaff refused a continuance and the case proceeded right through Rosh Hashanah.

"Of course, even your adolescent children know that Rosh Hashanah is not a 'joyous holiday'; that Rosh Hashanah and Yom Kippur are the two most solemn holidays in the Jewish year.

"It is reasonable to presume that Judge Pfaff too was under the impression that Rosh Hashanah is a solemn Jewish holiday until he heard Mr. Maidman's garbled exposition on Rosh Hashanah.

"Isn't it too bad that with the hundreds and hundreds of Jews in B'nai B'rith who know something about our Jewish religion, that such an individual is put into a position where he is able to, with ostensible authority, make all of us Jews look ridiculous.

"We wonder whether the thousands of members of B'nai B'rith who observe Rosh Hashanah with solemnity will not simply enthrall over Mr. Maidman's speech hereinabove quoted."

Maidman alleged that the editorial was entirely false and untrue, except that:

"1. It correctly states that a trial was in progress in the Superior Court of the State of California, Department 5, in Glendale before the Honorable Judge Roger A. Pfaff, entitled 'Frazier v. Pass'; and

"2. It correctly states that a gentile plaintiff was represented by attorney Samuel Maidman who is the chairman of the Administrative Board of the B'nai B'rith Record; and

"3. It correctly quotes a portion of the reporter's transcript of said trial."

Maidman's complaint also contained the following allegations:

That for more than 16 years Maidman has been, and still is, an active attorney at law in the county of Los Angeles; that he "has been and now is widely known as a lawyer and as one who is generally active in community affairs and has enjoyed a good name and reputation in Los Angeles and elsewhere"; that he had been an active leader of B'nai B'rith for many

years, having served as the president of his B'nai B'rith Lodge and as chairman, a member of the executive board, and as a member of several committees of the Western District organization of B'nai B'rith; that he had been, and was at the time that this editorial was published, "an active leader of the Jewish Community of Los Angeles"; that in March, 1955, he was elected chairman of the Administrative Board of the B'nai B'rith Record, a newspaper which is the official publication of the Southern California B'nai B'rith Council; that he was actively engaged in the performance of his duties as chairman of this board for three continuous years, from the date of his election until March 20, 1958; that the editorial is libelous in that it exposed plaintiff to hatred, contempt, ridicule and obloquy and conveyed the impression that Maidman was not worthy of being placed in a position of trust in Jewish affairs or in the Jewish community and was guilty of unprofessional conduct as an attorney; that the editorial was published with malice and with an intent to defame; that a retraction was demanded but no correction was published.

The allegation of malice is supported by a detailed résumé of a long-standing feud between the Messenger and the Record. The two newspapers have battled continuously, in the courts and in their columns, over use of the words "B'nai B'rith" in their respective mastheads and their respective methods of obtaining advertisers and subscribers. Copies of the correspondence between plaintiff and defendant Cummins and of various editorials which have appeared in the competing newspapers are incorporated into the complaint. These writings indicate that feelings of bitterness and hostility had characterized the relations of the parties for a considerable period of time. It is further alleged that the court incident mentioned in the editorial occurred in September, 1956, and that defendant acquired full knowledge of this incident within two weeks of that time but did not publish or circulate the editorial until more than 13 months thereafter.

Maidman contends that this complaint states a cause of action for libel *per se,* and that the trial court erred in sustaining defendants' demurrer. We agree with this contention.

Section 45 of the Civil Code defines libel as "a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Libel *per se* is defined as

"A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, . . ." (Civ. Code, § 45a.)

When measured by this test the editorial is unquestionably libelous *per se.* Maidman concedes that some of the factual statements contained in the editorial are true. But the editorializing upon those facts falls squarely within the statutory definition of libel. ■ Comments, opinions and criticisms may be defamatory even though based upon true or privileged statements of fact. The publisher is liable unless the comments themselves are privileged. (See 1 Harper and James, Torts, § 5.8, p. 371.) ■ "The code definition of libel is very broad and has been held to include almost any language which, upon its face, has a natural tendency to injure a person's reputation, either generally, or with respect to his occupation." (*Bates* v. *Campbell,* 213 Cal. 438, 441 [2 P.2d 383] ; see also *Tonini* v. *Cevasco,* 114 Cal. 266, 272 [46 P. 103] ; *Schomberg* v. *Walker,* 132 Cal. 224 [64 P. 290] ; *MacLeod* v. *Tribune Publishing Co.,* 52 Cal.2d 536 [343 P.2d 36] ; *Jeffers* v. *Screen Extras Guild, Inc.,* 107 Cal.App.2d 253 [237 P.2d 51] ; *Dethlefsen* v. *Stull,* 86 Cal.App.2d 499 [195 P.2d 56].)

■ The editorial in question could not have any effect other than to cause severe injury to the reputation of a person in Maidman's position. The editorial itself makes it clear that Maidman occupied a position of prominence in the Southern California Jewish community. It specifically states that he was "the 'Chairman of the Administrative Board of the B'nai B'rith Record,' the house organ of the Southern California Council of B'nai B'rith Lodges." The effect of this editorial, the whole tenor of which is sarcasm and derision, obviously would, and was intended to, expose Maidman to contempt and ridicule in said community, and would obviously cause him to be shunned and avoided by any who read it.

The editorial is captioned "An 'Important' Ben B'rith Interprets Rosh Hashanah." The word "Important" is set off in quotation marks. When the caption is read in conjunction with the body of the article, it is quite clear that the editorial intended to suggest that Maidman is, or should be, anything but important. After setting forth the quotation from the transcript, the editorial then suggests that Maidman knows less than an adolescent child about the nature of a Jewish holiday. The editorial also charges that Maidman, by his conduct, made "all of us Jews look ridiculous." It also accused Maidman of presenting a "garbled exposition on Rosh

Hashanah'' to the court. The contemptuous tone of the article is further emphasized by the use of quotation marks around words such as ''profound'' and ''learned'' in referring to Maidman's statements.

In *Brewer* v. *Second Baptist Church*, 32 Cal.2d 791 [197 P.2d 713], a church newspaper accused the plaintiffs, who were church members, of deliberately bringing false charges against the church. The article claimed that the plaintiffs had ''hurt the prestige and good name of the church,'' had caused the church to unnecessarily expend funds ''for attorneys fees,'' and had ''revealed themselves as totally unworthy of the continued confidence, respect, and fellowship of a great church which they have so grievously wronged.''

While that case is distinguishable from the case at bar, in that in the Brewer case this court held that the jury could have found a statement of fact to be untrue, that is, that the plaintiffs had not deliberately brought false charges against the church, the decision also takes cognizance of the defamatory character of the opinions expressed by the writer. ''Because of their alleged falsehoods plaintiffs were charged with having 'revealed themselves as totally unworthy of the continued confidence, respect, and fellowship of a great church.' They were described as persons willing to lie in order to injure their church. Plaintiff Fisher was charged with a vile spirit, and both plaintiffs were associated with one who 'under the role of a minister of Jesus, is one of Satan's choicest tools.' The charges were designed to injure plaintiffs' reputations in the church and to cause them to be shunned and avoided. The language was aptly chosen for this purpose.'' (*Id.*, at p. 796.)

█ While the language used by defendants to characterize Maidman was less severe than that used in the Brewer case, the comments and opinions claimed to be libelous need not reach the extremity of vituperation before they become libelous. Maidman, who was allegedly a prominent leader in Jewish affairs, was accused of being unworthy of his high position in B'nai B'rith, of knowing less about his religion than an adolescent child and of causing all Jewry to look ridiculous. The charges made by defendants were aptly chosen to expose Maidman to the contempt and ridicule of the other members of B'nai B'rith as well as of his coreligionists generally. █ ''. . . [I]t makes no difference what the nature of the employment is, provided it is lawful, or whether the conduct imputed is such as in itself the law will blame or not, *provided it is inconsistent with the due fulfillment of*

*what the party, in virtue of his employment or office, has undertaken.*" (Emphasis added.) (*Tawney* v. *Simonson, Whitcomb & Hurley Co.* (1909), 109 Minn. 341 [124 N.W. 229, 232].) The editorial here in question meets this test on its face, without the necessity of resorting to extrinsic material. Therefore, it is libelous *per se.* (Civ. Code, § 45a.)

It should also be pointed out that the editorial also tends to injure Maidman in his occupation. It implies that plaintiff, in his professional capacity as a lawyer, deliberately misled the court concerning the nature of the holiday in order to obtain an advantage for himself and his client while placing the opposing parties at a disadvantage. "A defendant is liable for what is insinuated, as well as for what is stated explicitly." (*Bates* v. *Campbell, supra,* 213 Cal. 438, 442; *MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536.) "The fact that an implied defamatory charge or insinuation leaves room for an innocent interpretation as well does not establish that the defamatory meaning does not appear from the language itself. The language used may give rise to conflicting inferences as to the meaning intended, but when it is addressed to the public at large, it is reasonable to assume that at least some of the readers will take it in its defamatory sense." (*MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d at p. 549.) To accuse an attorney of deliberately misleading a court, whether this be done directly or indirectly, is obviously to injure the attorney's reputation, generally, *and* with respect to his occupation. Since the article could reasonably have been understood to make such a charge it is for the trier of fact to determine if the readers did so understand it. (*MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d at pp. 546-547.)

Although the editorial is libelous *per se,* the defendants properly contend that the complaint itself reveals the existence of the defense of "fair comment." "It is not only the privilege but the duty of every citizen and every newspaper in the community to fairly and impartially criticize the faults and misconduct of public officers, . . ." (*Jones* v. *Express Pub. Co.,* 87 Cal.App. 246, 257 [262 P. 78].) Statements of opinion, although of a defamatory nature, are privileged in California under section 47, subdivision 3, of the Civil Code. (*Schomberg* v. *Walker, supra,* 132 Cal. 224, 229; *Taylor* v. *Lewis,* 132 Cal.App. 381 [22 P.2d 569]; *Jones* v. *Express Pub. Co., supra.*) Maidman held a position of importance in the Southern California Jewish

community. It was therefore of legitimate interest to members of that community, who would be the most likely readers of the defendant newspaper, to know whether Maidman was qualified for his position. (*Brewer* v. *Second Baptist Church, supra,* 32 Cal.2d 791, 796-797.) Hence defendants could legitimately comment upon and criticize Maidman's activities, even though the criticism adversely affected Maidman's reputation.

But this defense of fair comment is not absolute. There is no absolute right to destroy a person's name and reputation by publication of defamatory criticisms and opinions merely because the victim's activities are a matter of legitimate public interest. The protection which the law affords to those who would comment or criticize extends only to comment which is "fair," not in the sense that it must be reasonable or moderate, but in the sense that it must be published "in part at least, for the bona fide purpose of giving the public the benefit of comment which it is entitled to have, rather than for any ulterior motive of causing harm to the plaintiff." (Prosser on Torts (2d ed. 1955), p. 623; *Brewer* v. *Second Baptist Church, supra,* 32 Cal.2d 791, 797.) Allegations that the comments were *not* published primarily for a bona fide purpose, but were published *because of malice,* renders the publisher liable if his comments, opinions or criticisms are defamatory. (*Schomberg* v. *Walker, supra,* 132 Cal. 224; *Snively* v. *Record Publishing Co.,* 185 Cal. 565 [198 P. 1]; *Brewer* v. *Second Baptist Church, supra,* 32 Cal.2d 791; *Jones* v. *Express Pub. Co., supra,* 87 Cal.App.246; *Taylor* v. *Lewis, supra,* 132 Cal.App. 381; *O'Connor* v. *Sill* (1886), 60 Mich. 175 [27 N.W. 13, 16]; *Bearce* v. *Bass* (1896), 88 Me. 521 [34 A. 411]; *Cherry* v. *Des Moines Leader* (1901), 114 Iowa 298 [86 N.W. 323, 325, 54 L.R.A. 855]; *Triggs* v. *Sun Printing & Publishing Ass'n.* (1904), 179 N.Y. 144 [71 N.E. 739, 742]; *Arnold* v. *Ingram* (1912), 151 Wis. 438 [138 N.W. 111, Ann. Cas. 1914C 776]; *Flanagan* v. *Nicholson Pub. Co.* (1915), 137 La. 588 [68 So. 964, 968, L.R.A. 1917E 510]; *McClung* v. *Pulitzer Pub. Co.* (1919), 279 Mo. 370 [214 S.W. 193, 200-201]; *Foley* v. *Press Pub. Co.* (1929), 226 App. Div. 535 [235 N.Y.Supp. 340], which contains an interesting discussion of the early history of "fair comment"; *Hoeppner* v. *Dunkirk Printing Co.* (1930), 254 N.Y. 95 [172 N.E. 139, 140, 72 A.L.R. 913]; *Holway* v. *World Pub. Co.* (1935), 171 Okla. 306, 44 P.2d 881, 886]; *Kinsley* v. *Herald & Globe Ass'n.* (1943), 113 Vt. 272 [34 A.2d 99, 102, 148 A.L.R. 1164]; *Berg* v. *Printers' Ink Pub. Co.* (1943) [S.D.N.Y.], 54 F.Supp. 795, 797;

*Griffin* v. *Opinion Pub. Co.* (1943), 114 Mont. 502 [138 P.2d 580, 589] ; *Bausewine* v. *Norristown Herald* (1945), 351 Pa. 634 [41 A.2d 736, 742] ; *Kennedy* v. *Item Co.* (1948), 213 La. 347 [34 So.2d 886, 892] ; *Matarazzo* v. *Daily Gazette Co.* (1949), 276 App.Div. 249 [93 N.Y.S.2d 587, 588-589] ; aff'd. 302 N.Y. 551 [96 N.E.2d 442] ; *Fitzjarrald* v. *Panhandle Pub. Co.* (1950), 149 Tex. 87 [228 S.W.2d 499, 504] ; *State Press Co.* v. *Willett* (1952), 219 Ark. 850 [245 S.W.2d 403, 405] ; *Tiernan* v. *East Shore Newspapers* (1953), 1 Ill.App.2d 150 [116 N.E.2d 896, 898] ; *Cohen* v. *Cowles Publishing Co.* (1954), 45 Wn.2d 262 [273 P.2d 893, 894] ; 1 Harper and James, Torts, § 5.28, pp. 457, 462.)

Maidman alleged that this editorial was published maliciously. "Said editorial was published and circulated by defendants with malice and oppression toward plaintiff, with wanton disregard of his rights and feelings, and with the deliberate intent and purpose of disgracing and defaming plaintiff and injuring him in his reputation, standing and stature in the Jewish community, in B'nai B'rith, and in the practice of his profession as an attorney at law and among his present and prospective Jewish and other clients; and said editorial was not only false as herein alleged, but at the time it was published and circulated, was known by defendants to be false as herein alleged, and defendants did not have probable or any cause for believing it to be true."

Maidman also set forth specific facts which indicate that the comments might indeed have been motivated by personal malice rather than by a desire to enlighten the public. He alleged that a long-standing feud had existed between the defendant newspaper and the newspaper of which he was publisher. Charges, countercharges and denials had appeared in the columns of both, but particularly in those of the defendant. Some of these editorials were quite abusive. Maidman also alleged that the editorial involved in the present action had been published 13 months after the described event had taken place. This fact certainly suggests that the editorial was not published primarily for the bona fide purpose of presenting current information to the public.

A general allegation of malice is not sufficient unless the article itself lends support to such a conclusion. (*Locke* v. *Mitchell*, 7 Cal.2d 599 [61 P.2d 922] ; *Glenn* v. *Gibson,* 75 Cal. App.2d 649 [171 P.2d 118] ; *Taylor* v. *Lewis, supra,* 132 Cal. App. 381.) In the present case, Maidman has alleged the existence of detailed facts which would justify the trier of

fact in finding that the editorial was published primarily because of "hatred or ill will towards the plaintiff." (Civ. Code, § 48a, subd. 4(d) ; *Hearne* v. *De Young*, 132 Cal. 357, 361 [64 P. 576] ; *Davis* v. *Hearst*, 160 Cal. 143, 157-163 [116 P. 530] ; *Snively* v. *Record Publishing Co., supra,* 185 Cal. 565; *Siemon* v. *Finkle*, 190 Cal. 611 [213 P. 954] ; *Gudger* v. *Manton*, 21 Cal.2d 537, 543 [134 P.2d 217] ; *Freeman* v. *Mills,* 97 Cal.App. 2d 161, 167-168 [217 P.2d 687].) The allegations of malice are sufficient to rebut the existence of the defense of fair comment. Hence the complaint states a good cause of action for libel *per se.*

 Defendants contend that Maidman failed to adequately allege special damages. Special damages need not be alleged when the complaint states a cause of action for libel *per se.* (Civ. Code, § 45a; *MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, 549.)

The judgment is reversed.

Gibson, C. J., Traynor, J., and Dooling, J., concurred.

McCOMB, J.—I dissent.

I believe the courts should apply the same rules to all litigants, regardless of their race, color or religion. In the present case the majority applies a rule to persons of the Jewish religion which would not be applied to those of the Christian religion. This is made evident by substituting in the editorial*

---

*The editorial which is the subject of the present litigation reads:

"AN 'IMPORTANT' BEN B'RITH INTERPRETS ROSH HASHANAH

"A trial was in progress in the Superior Court of the State of California, Department 5, in Glendale—before the Honorable Judge Roger A. Pfaff, entitled Frazier v. Pass. A Gentile attorney was representing two Jewish defendants, and a Gentile plaintiff was represented by attorney Samuel Maidman who is the 'Chairman of the Administrative Board of the B'nai B'rith Record,' the house organ of the Southern California Council of B'nai B'rith Lodges.

"The Gentile attorney, out of respect for his two Jewish clients, asked Judge Pfaff if he could have a continuance for his Jewish clients inasmuch as 'tomorrow' was a Jewish holiday, Rosh Hashanah, and that his clients would like to observe the Jewish holiday.

"Judge Pfaff, knowing that Samuel Maidman is Jewish, asked Mr. Maidman if he had any objections. Whereupon Mr. Samuel Maidman, 'Chairman of the Administrative Committee of the B'nai B'rith Record,' gave the Court this 'profound' and 'learned' discourse on the meaning and value of Rosh Hashanah.

"The following quotations are word for word from the Reporter's Transcript:

" 'I have that same problem but out of the good book there is a provision which says on a joyous holiday such as a new year people may do a duty, and not do penance. The holiday where I think it is generally observed that we don't observe our daily habits is—so far as duties are

the words (1) *Christian* for B'nai B'rith and Jewish, (2) *Christmas* for Rosh Hashanah, (3) *Easter* for Yom Kippur, and (4) *John Jones* for Mr. Maidman. The editorial so worded would clearly not be libelous. It would read:

### AN "IMPORTANT" CHRISTIAN INTERPRETS CHRISTMAS

A trial was in progress in the Superior Court of the State of California, Department 5, in Glendale—before the Honorable Judge Roger A. Pfaff, entitled *Levy* v. *Smith*. A Jewish attorney was representing two Christian defendants, and a Jewish plaintiff was represented by attorney John Jones, who is the "Chairman of the Administrative Board of the Christian Record," the house organ of the Southern California Council of Christian Lodges.

The Jewish attorney, out of respect for his two Christian clients, asked Judge Pfaff if he could have a continuance for his Christian clients inasmuch as "tomorrow" was a Christian holiday, Christmas, and that his clients would like to observe the Christian holiday.

Judge Pfaff, knowing that John Jones is Christian, asked Mr. Jones if he had any objections. Whereupon Mr. John Jones, "Chairman of the Administrative Committee of the Christian Record," gave the court this "profound" and "learned" discourse on the meaning and value of Christmas.

The following quotations are word for word from the reporter's transcript:

"I have that same problem but out of the good book there is a provision which says on a joyous holiday such as

concerned—is Yom Kippur, which is the holiday next week, so if I can serve my client I have a duty which I think the good Lord . . .'

"Then Mr. Maidman let the Court and all of his auditors know that he ought to know something about this matter of the proper observance of Rosh Hashanah since he is the Chairman of the Administrative Board of the B'nai B'rith Record, which is tantamount to 'publisher.'

"After Mr. Maidman's profound interpretation, i.e., that Rosh Hashanah is a 'joyous holiday,' Judge Pfaff refused a continuance and the case proceeded right through Rosh Hashanah.

"Of course, even your adolescent children know that Rosh Hashanah is not a 'joyous holiday'; that Rosh Hashanah and Yom Kippur are the two most solemn holidays in the Jewish year.

"It is reasonable to presume that Judge Pfaff too was under the impression that Rosh Hashanah is a solemn Jewish holiday until he heard Mr. Maidman's garbled exposition on Rosh Hashanah.

"Isn't it too bad that with the hundreds and hundreds of Jews in B'nai B'rith who know something about our Jewish religion, that such an individual is put into a position where he is able to, with ostensible authority, make all of us Jews look ridiculous.

"We wonder whether the thousands of members of B'nai B'rith who observe Rosh Hashanah with solemnity will not simply enthrall over Mr. Maidman's speech hereinabove quoted."

Christmas people may do a duty, and not do penance. The holiday where I think it is generally observed that we don't observe our daily habits is—so far as duties are concerned—is Easter, which is the holiday next spring, so if I can serve my client I have a duty which I think the good Lord. . . ."

Then Mr. Jones let the court and all of his auditors know that he ought to know something about this matter of the proper observance of Christmas since he is the Chairman of the Administrative Board of the Christian Record, which is tantamount to "publisher."

After Mr. Jones' profound interpretation, *i.e.*, that Christmas is a "joyous holiday," Judge Pfaff refused a continuance and the case proceeded right through Christmas.

Of course, even your adolescent children know that Christmas is not a "joyous holiday"; that Christmas and Easter are the two most solemn holidays in the Christian year.

It is reasonable to presume that Judge Pfaff too was under the impression that Christmas is a solemn Christian holiday until he heard Mr. Jones' garbled exposition on Christmas.

Isn't it too bad that with the hundreds and hundreds of Christians in Christian lodges who know something about our Christian religion, that such an individual is put into a position where he is able to, with ostensible authority, make all of us Christians look ridiculous.

We wonder whether the thousands of members of Christian lodges who observe Christmas with solemnity will not simply enthrall over Mr. Jones' speech hereinabove quoted.

The complaint, in my opinion, does not state a cause of action for libel. These rules are here applicable:

(1) Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation. (Civ. Code, § 45.)

(2) It is not libelous to state that one has done a legal act even though strong epithets are used in describing the act. (*Sullivan* v. *Warner Bros. Theatres, Inc.,* 42 Cal.App.2d 660, 663 [5] [109 P.2d 760] [hearing denied by the Supreme Court].)

(3) In actionable defamation it is necessary that there be defamation apparent from the words themselves, without the use of an innuendo altering their sense. (*Emde* v. *San Joaquin*

*County etc. Council,* 23 Cal.2d 146, 159 [7] [143 P.2d 20, 150 A.L.R. 916].)

(4) There is no libel if the charge against plaintiff is true, irrespective of the wording used in making the charge. (*Emde* v. *San Joaquin County etc. Council, supra* at 160 [8] ; *Babcock* v. *McClatchy Newspapers,* 82 Cal.App.2d 528, 536 [186 P.2d 737] ; *Glenn* v. *Gibson,* 75 Cal.App.2d 649, 657 [1], 661 [6] [171 P.2d 118] ; *McLaughlin* v. *Standard Acc. Ins. Co.,* 15 Cal. App.2d 558, 568 [4] [59 P.2d 631] [hearing denied by the Supreme Court].)

(5) Mere expressions of opinion or severe criticism are not libelous if they go only to the merits or demerits of a condition, cause or controversy which is under public scrutiny even though they may reflect adversely upon the activities of an individual. (*Howard* v. *Southern Cal. etc. Newspapers,* 95 Cal.App.2d 580, 584 [3] [213 P.2d 399] ; *Babcock* v. *Mc-Clatchy Newspapers, supra* at 535 [6] ; *Eva* v. *Smith,* 89 Cal. App. 324, 328 [2] et seq. [264 P. 803] ; *cf. Glenn* v. *Gibson, supra* at 659 [4] ; *Gosewisch* v. *Doran,* 161 Cal. 511, 514 [119 P. 656, Ann.Cas. 1913D 442].)

Applying the foregoing rules to the facts of the present case, it appears that plaintiff admits that he made the statements quoted from the reporter's transcript during the progress of the trial in Judge Pfaff's court and that he is chairman of the administrative board of B'nai B'rith Record; therefore, his general allegation of falsity is inconsistent with his specific admission of the statements quoted from the reporter's transcript.

It is clear that these statements were made in response to opposing counsel's request for a continuance and that plaintiff did not acquiesce in that request; therefore, the following words from the editorial constitute the sole statement upon which libel may possibly be predicated: "Isn't it too bad that with the hundreds and hundreds of Jews in B'nai B'rith who know something about our Jewish religion, that such an individual is put into a position where he is able to, with ostensible authority, make all of us Jews look ridiculous.

"We wonder whether the thousands of members of B'nai B'rith who observe Rosh Hashanah with solemnity will not simply enthrall over Mr. Maidman's speech hereinabove quoted."

The foregoing statement is merely a fair comment upon the conceded statements of plaintiff. It is a matter of common knowledge, of which this court will take judicial notice, that

Rosh Hashanah is a day intended to be devoted to prayer. It is traditionally regarded by the Jewish race as a day commemorating the creation of the world, a day on which God remembers all of His creatures and determines the lot of human beings during the coming year. He passes judgment upon all persons who are thus summoned to earnest self judgment, to atonement and to self improvement. (Code Civ. Proc., § 1875, subd. 1; Webster's Internat. Dict. (2d ed. 1957), p. 2170; 9 Universal Jewish Ency. (1948), p. 227; *Blount* v. *Sixteenth St. Baptist Church,* 206 Ala. 423 [90 So. 602, 603 [2, 3]]; *State* v. *Town Council,* 18 R.I. 258 [27 A. 599, 605]; *State* v. *District Board of School-Dist. No. 8 of Edgerton,* 76 Wis. 177 [44 N.W. 967, 972, 7 L.R.A. 330]; *Shaffer* v. *Temple Beth Emeth of Flatbush,* 198 App.Div. 607 [190 N.Y.S. 841, 843 [1-3]]; 20 Am.Jur. (1939), Evidence, § 66, p. 88; 31 C.J.S. (1942), Evidence, § 30, p. 575, § 93, p. 689.)

It appears that the editorial in question was not susceptible of an interpretation which would give it the character of a libelous publication.

Our American system of permitting expression of opinion or severe criticism where it goes only to the merits or demerits of a condition, cause or controversy which is under public scrutiny would be the first liberty erased if the philosophy of the swastika or the hammer and sickle ever took hold in the United States of America.

Finally, there was not a proper allegation of special damages. A defamatory publication not libelous *per se* is not actionable unless plaintiff alleges and proves special damages. (Civ. Code, § 45a; *Smith* v. *Los Angeles Bookbinders Union, No. 63,* 133 Cal.App.2d 486, 494 [9] [284 P.2d 194]; *Babcock* v. *McClatchy Newspapers, supra,* 82 Cal.App.2d 528, 537 [9]; *Peabody* v. *Barham,* 52 Cal.App.2d 581, 585 [6] [126 P.2d 668].)

Plaintiff merely alleged: "As a further direct and proximate result of the publication of the libelous editorial of November 15, 1957, plaintiff has been greatly injured in his profession as an attorney at law, and has suffered a diminution of his income therefrom. The exact amount of plaintiff's damages therefrom is unknown at this time, and when ascertained an amendment to this complaint will be made."

The foregoing allegation is merely that plaintiff has been injured in his profession and as a result has lost income therefrom.

An allegation that plaintiff has been injured in his trade,

business and occupation in a designated sum by reason of publication of alleged libelous matter is insufficient to aver special damages. (*Smith* v. *Los Angeles Bookbinders Union, No. 63, supra,* 133 Cal.App.2d 486, 494 [10] et seq.; *Gang* v. *Hughes,* 111 F.Supp. 27, 29 [2] ; *Anderson* v. *Hearst Publications Co.,* 120 F.Supp. 850, 852 [1].)

When special damages are claimed, the nature of the loss or injury must be particularly set forth. (*Peabody* v. *Barham, supra,* 52 Cal.App.2d 581, 585 [8] ; *cf. Pridonoff* v. *Balokovich,* 36 Cal.2d 788, 792 [4] [228 P.2d 6].)

I would affirm the judgment.

Schauer, J., and White, J., concurred.