[Civ. No. 30430.   Second Dist., Div. Five.   Feb. 8, 1967.]

BRUCE A. FRIEDMAN, Plaintiff and Appellant, v. PETER KNECHT et al., Defendants and Respondents.

Hillel Chodos for Plaintiff and Appellant.

Harold W. Kennedy, County Counsel, and Lloyd S. Davis, Chief Deputy County Counsel, for Defendants and Respondents.

KAUS, P. J.—The genesis of this appeal is a donnybrook which took place on April 27, 1965, in the Municipal Court of the Beverly Hills Judicial District when the People, repre-

sented by the now defendant Knecht, then a Deputy District Attorney, moved for a continuance of the trial in an action entitled People v. M. Plaintiff Friedman was the attorney who represented the defendant M. on a charge of prostitution. He wanted to go to trial.

Because of certain things which Knecht said about Friedman in the proceedings that followed, this slander action was filed in the superior court; both Knecht and the County of Los Angeles were named as defendants. A demurrer to Friedman's first amended complaint was sustained with leave to amend. Friedman declined to do so and a dismissal was entered. He appealed.

The only question on appeal is whether or not the defendant's remarks were privileged.

A transcript of the proceedings is attached to the complaint as an exhibit. The following is a summary:

The case was called. Knecht announced that Officer Wald, who was to be the People's witness, was recuperating from an operation for cancer, but would be available within a week. Friedman opposed the continuance, pointing out that the case had been set for "last Monday"—presumably, April 19, 1965—that the matter could obviously not be tried within 10 days from that day as required by section 1382 of the Penal Code unless the defendant consented, and that she was not about to do so.

In reply Knecht argued that the case had been pending for seven months, that numerous continuances had been obtained by Miss M. without opposition although on each occasion the People were ready, and that Mr. Wald had been operated on at Mount Sinai Hospital on the very morning of April 19. Knecht reminded the court that Friedman had opposed the People's motion for continuance on that day and had appeared to doubt the fact of the operation. Knecht said he had then told Friedman in confidence at what hospital it was being performed and that in violation of his trust, Friedman had told Miss M. where the officer was, that Miss M. had then visited the officer at the hospital "while he was on his back and in a gown and completely defenseless and helpless." Knecht claimed that she had harassed him and had ranted and raved. He then requested the court to admonish Friedman and Miss M. not to get in touch with the officer until he was ready to appear in court.

Friedman then asked leave to reply to this accusation. The court said: "Frankly, I am more interested in what his condi-

tion is at this time than all this froufrou." Friedman said he wanted to reply to Knecht anyway, and the court permitted him to proceed.

Friedman then claimed that Knecht had identified the hospital, not in confidence, but in open court; his client had merely used the same technique "against a vice officer which the vice officers used against their suspects"; there was nothing wrong in what his client had done—she had merely hoped that the officer would make some admission which she could use at her trial.

At this point, Friedman took the offensive. He declared: "Now, Mr. Knecht this morning talked to me here in court and he has made it a personal threat against me. He stated if this conduct continued, he is going to get me in trouble with the Bar Association. I want Mr. Knecht admonished not to make threats against me for perfect rights which the defendant may exercise."

It is apparent that by now the court had been requested to act on three matters (1) the People's motion for a continuance; (2) the People's request to admonish Friedman and Miss M. to leave the officer alone; and (3) Friedman's request that Knecht be admonished not to make threats against him.

Friedman then continued to argue that unless the case was brought to trial within 10 days of April 19, a dismissal was mandatory. He said that he was addressing himself to the court not only as a judge, "I am going to appeal to the court's capacity as [a] humanitarian." He then described what it meant to his client to have a charge of prostitution hanging over her head for seven months. Knecht then replied as follows: "Now, may I be heard for a moment? This case has been originally set as I told the Court approximately seven months ago. It was continued numerous times at the defendant's request, and it became quite apparent why the continuances were requested; namely because *upon this court appointed case, counsel saw fit to attempt to sue the county for $150 for false arrest. I don't know what his strong interests are in this case.* I don't know whether the defendant is guilty or not, but I don't [do?] know, counsel, who put her in this position. I think she put herself in this position." (Italics ours.)

The italicized portion of this statement is the first specification of slander in Friedman's complaint.

The court then, somewhat plaintively asked: "Nevertheless,

would somebody give me more[1] information about the condition of Mr. Wald.''

Both counsel then tried to comply with the court's request, though not in identical tenor. Friedman admitted that he had obtained his information from his client. This apparently reminded Knecht of his earlier grievance and he *again* complained about the conduct of Friedman and Miss M.

The court then said: ''Mr. Friedman, I do not want to get embroiled in this particular aspect of the matter, and certainly not at this time, nor do I have any intention of exhorting either you or your client of [or?] Mr. Knecht. I am interested in one thing. I have a calendar to run. If I consider the cause sufficient, I will continue it; if not, I won't.''

Then there were further inquiries by the court about the officer's condition, further argument by Friedman that his client had done nothing wrong in seeking him out and that the case had to be brought to trial or dismissed. He then made a formal motion for dismissal. Before the court had a chance to rule on that motion, Knecht said in an apparent desire not to leave anything unanswered: ''I would like to also answer the statement made by counsel regarding the threat or alleged threat that I was going to have him disciplined by the Bar Association. I merely stated *there is no wonder that they have disciplined or attempted to discipline him in the past for the kind of conduct he has shown here today.*'' (Italics ours.)

The italicized portion of that statement is the second specification of slander.

Thereafter the case was continued for trial to May 4, 1965.

All parties recognize that the central question on appeal is whether or not Knecht's remarks were privileged under the provisions of section 47, subdivision 2 of the Civil Code,[2] as

---

[1] *The court was kind. So far nobody had made any effort to answer the court's identical question, asked earlier.*

[2] ''A privileged publication or broadcast is one made . . . In any . . . judicial proceeding . . . provided, that an allegation or averment contained in any pleading or affidavit filed in an action for divorce or an action prosecuted under Section 137 of this code made of or concerning a person by or against whom no affirmative relief is prayed in such action shall not be a privileged publication or broadcast as to the person making said allegation or averment within the the meaning of this section unless such pleading be verified or affidavit sworn to, and be made without malice, by one having reasonable and probable cause for believing the truth of such allegation or averment and unless such allegation or averment be material and relevant to the issues in such action.''

interpreted recently in *Thornton* v. *Rhoden*, 245 Cal.App.2d 80, 90 [53 Cal.Rptr. 706].

In *Thornton* the court adopted the formulation of the privilege of section 586 of the Restatement of Torts: ■ "An attorney at law is absolutely privileged to publish false and defamatory matter of another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of a judicial proceeding in which he participates as counsel, if it has some relation thereto." Comment c. to section 586 reads in part as follows: "The privilege stated in this Section is confined to statements made by an attorney while performing his function as such. Therefore it is available only when the defamatory matter has some reference to the subject matter of the pending litigation, although it need not be strictly pertinent or relevant to any issue involved therein. . . ."

In his complaint Friedman claims that the intended and conveyed meaning of the first slanderous remark was that his defense of Miss M. was motivated by an illicit relationship. Granted that it is possible to give that meaning to Knecht's remarks and, granted further, for the sake of argument, that a statement that Friedman was having an affair with his client is wildly unrelated to anything that was going on in the courtroom that day, no such unrelated meaning necessarily attached to the statement.

In *Thornton* v. *Rhoden, supra,* 245 Cal.App.2d 80, 93, the court quoted with approval the following statement from Veeder, *Absolute Immunity in Defamation, Judicial Proceedings* (1909) 9 Colum.L.Rev. 463, 600, 612: ■ " 'At all events, it is held that doubts are to be resolved in favor of relevancy and pertinency; that is to say, the matter to which the privilege does not extend must be so palpably wanting in relation to the subject matter of the controversy that there can be no reasonable doubt of its impropriety.' " If the privilege is worth having, its purpose would be largely defeated if it were to vanish simply because one possible meaning of a statement made during judicial proceedings does not relate to them.

■ In determining whether the remark "related to" the proceedings, we have to keep in mind what the proceedings were: primarily a motion for continuance, with cross-motions for censure of counsel. Although the Penal Code requires motions for continuance to be made "upon affirmative proof in open court" (Pen. Code, § 1050) and the Code of Civil

Procedure specifies that such motions, when based on the absence of evidence, be made on affidavits (Code Civ. Proc., § 595.4), they are quite commonly heard on oral representations by counsel. The matters germane to the court's ruling range all the way from the health of witnesses to the true significance of religious holidays. *Maidman* v. *Jewish Publications, Inc.*, 54 Cal.2d 643, 646-647 [7 Cal.Rptr. 617, 355 P.2d 265, 87 A.L.R.2d 439].) Plaintiff himself apparently thought it appropriate to place his opposition on "humanitarian" as well as on legal grounds. Although the court's ruling on a motion for continuance often determines the outcome of the litigation, it must be made immediately, based only on the information which counsel are able to furnish during a brief, oral submission. Under these circumstances it is difficult to criticize counsel for bringing up all the equities in their favor—or, for that matter, the inequities which in their view color their opponents' position.

With these facts of courtroom life in mind, it becomes quite apparent that Knecht's first remark related to the proceedings.

Obviously the only part of the statement to which any objection could be made are the words: "I don't know what his strong interests are in this case." This simply means that in Knecht's submission, Friedman's opposition to the motion for a continuance—together with his justification for his conduct in connection with Miss M's. hospital visit—was more vigorous than Knecht thought proper. Giving Knecht the benefit of the doubt, as we must, the remark relates to matters in the record in three ways: (1) right or wrong, Knecht apparently thought that his failure to oppose previous continuances entitled him to a reciprocal courtesy, which was being withheld because of plaintiff's unusually strong interests in the case; (2) these same interests had caused plaintiff to violate a confidence; and (3) the remarks is a comment on plaintiff's appeal to the court as a humanitarian which perhaps struck Knecht as being more dramatic than the occasion called for.

■ While the second slanderous remark is more obviously defamatory than the first, Friedman has no one but himself to blame that it became pertinent to the proceedings. At the outset the court indicated that it did not want to hear anything except matters strictly pertinent to the motion for a continuance. Friedman, however, insisted on answering Knecht's charge regarding Miss M's. sickroom visit and was

given leave to do so. He then made his own charge concerning Knecht's alleged threat to take him before the Bar Association and requested sanctions. The second slanderous remark falls squarely within the issues delineated by Friedman himself. Knecht merely stated his own version of what he, Knecht, had said.

Again we are not concerned with Knecht's motives, his possible malice or his lack of belief in the truth of what he was saying. (*Thornton* v. *Rhoden,* 245 Cal.App.2d 80, 93 [53 Cal.Rptr. 706].)

At the oral argument of this matter, we were privileged to hear counsel for Friedman make a thoroughly eloquent and moving plea for the right of an attorney not to be slandered by his adversary. Indeed, if Friedman can prove every allegation of his complaint, particularly Knecht's alleged motives and knowledge of the falsity of his statements, Knecht certainly has not behaved well and appropriate sanctions through disciplinary channels or by way of contempt would have been appropriate. We are satisfied that in all but an infinitesimal number of cases such sanctions are adequate to curb those who would abuse their privilege and, at the same time, to protect an attorney whom his opponent might be tempted to slander. ▮ The privilege of section 47, subdivision 2 of the Civil Code, however, is based on the desire of the law to protect attorneys in their primary function—the representation of a client—an interest which is deemed more important than the attorney's personal interest in not being slandered. The best justification of the privilege known to us was given by the Court of Appeal in *Munster* v. *Lamb* (1883) 11 Q.B.D., 588, 604, 607, wherein one judge said: ''The reason of the rule is, that a counsel, who is not malicious and who is acting bona fide, may not be in danger of having actions brought against him. If the rule of law were otherwise, the most innocent of counsel might be unrighteously harassed with suits, and therefore it is better to make the rule of law so large that an innocent counsel shall never be troubled, although by making it so large counsel are included who have been guilty of malice and misconduct.'' In similar vein another judge announced: ''The rule of law exists, not because the conduct of those persons ought not of itself to be actionable, but because if their conduct was actionable, actions would be brought against judges and witnesses in cases in which they had not spoken with malice, in which they had not spoken with falsehood. It is not a desire to prevent actions

from being brought in cases where they ought to be maintained that has led to the adoption of the present rule of law; but it is the fear that if the rule were otherwise, numerous actions would be brought against persons who were merely discharging their duty. It must always be borne in mind that it is not intended to protect malicious and untruthful persons, but that it is intended to protect persons acting bona fide, who under a different rule would be liable, not perhaps to verdicts and judgments against them, but to the vexation of defending actions.''

We hope it is of some comfort to the plaintiff that his suit fails for the good of his profession.

The judgment is affirmed.

Hufstedler, J., and Stephens, J., concurred.

A petition for a rehearing was denied February 24, 1967, and appellant's petition for a hearing by the Supreme Court was denied April 5, 1967.