Filed 3/7/16  Zadok v. Tarzana Springs CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| DANNY ZADOK,<br><br>    Plaintiff, Cross-defendant and Appellant,<br><br>    v.<br><br>TARZANA SPRINGS, LLC et al.,<br><br>    Defendants, Cross-defendants and Respondents;<br><br>TOP NOTCH TOWING, INC.,<br><br>    Defendant and Cross-complainant. | B252781<br><br>(Los Angeles County<br>Super. Ct. No. BC474773)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on February 11, 2016, be modified as follows:

On page 3, third sentence of the last full paragraph, the phrase "Garcia believed was" is to be inserted between the words "as" and "required" so that the sentence reads:

> Zadok, however, did not send a copy of his opposition to the Department of Motor Vehicles as Garcia believed was required to stop the sale.

There is no change in the judgment.  Appellant's petition for rehearing is denied.

_____       _____       _____

ZELON, Acting P. J.       SEGAL, J.       BLUMENFELD, J.[*]

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| DANNY ZADOK,<br><br>    Plaintiff, Cross-defendant and Appellant,<br><br>    v.<br><br>TARZANA SPRINGS, LLC et al.,<br><br>    Defendants, Cross-defendants and Respondents;<br><br>TOP NOTCH TOWING, INC.,<br><br>    Defendant and Cross-complainant. | B252781<br><br>(Los Angeles County<br>Super. Ct. No. BC474773) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald M. Sohigian, Judge.  Affirmed in part and reversed in part.

Law Office of Rafi Moghadam and Rafi Moghadam for Plaintiff, Cross-defendant and Appellant.

Early, Maslach & Hartsuyker, Ronald R. Heard and B. Eric Nelson for Defendants, Cross-defendants and Respondents.

_____

## INTRODUCTION

This case involves a landlord-tenant dispute that arose when the landlord towed the tenant's old and inoperable car from the premises because of alleged lease violations. The towing company sold the car for its salvage value of $450 when the tenant failed to pick up his car and pay the towing and storage fees.

The tenant, Danny Zadok, sued the landlord, Tarzana Springs, LLC, the property manager, G & K Management Co., Inc. (G&K), and the towing company, Top Notch Towing, Inc. (TNT), alleging breach of contract, negligence, and conversion. TNT filed a cross-complaint seeking indemnification from Tarzana Springs and G&K and the recovery of its towing and storage fees from Zadok. After a bench trial, the trial court found that Tarzana Springs had the contractual right to tow the car and that Zadok owed TNT $2,350 for towing and storage fees. The court entered judgment accordingly.

Zadok appeals from that judgment, raising numerous issues, many of which were not raised in the trial court. We will address the merits of only those issues that Zadok arguably presented below, including his challenge to: (1) the trial court's denial of his request for a continuance; (2) the trial court's alleged failure to protect him from being misled about his counsel's abandonment; (3) the trial court's evidentiary rulings; and (4) the trial court's award of affirmative relief to TNT, a corporation not represented at trial. We affirm the judgment in favor of all defendants on Zadok's complaint and reverse the judgment against Zadok on TNT's cross-complaint.

## FACTUAL BACKGROUND

In 1994, Zadok became a tenant at Tarzana Springs, an apartment complex managed by G&K. Over the years, he renewed his lease. On May 9, 2008, Zadok signed the lease at issue,[1] which contains an addendum entitled "Addendum to Residential Lease

---

[1]     Above his signature, Zadok wrote: "compar[e] to original 1/22/94." He claimed that he was "forced to sign" the Lease, and that his notation indicated his agreement to the terms that were "consistent with the original contract."

2

Parking Agreement" (the Lease). Under the Lease, Zadok was assigned two parking spaces for his two vehicles—a 1986 Chevrolet Caprice and a 2001 Ford Expedition.

The Lease contains numerous provisions that restrict parking at Tarzana Springs and authorize the landlord to tow away vehicles parked in violation of those restrictions. One provision states that an assigned space must be used for parking of a vehicle "in good working order" with current registration and must not be used for storage. Another provision authorizes towing when a tenant fails to move a vehicle for facility maintenance after receiving prior notice.

On December 16, 2010, Tarzana Springs, acting through G&K, directed TNT to tow Zadok's Caprice from its assigned space. Steven Ray Garcia, TNT's owner, was the person who towed the Caprice. The car was towed, according to Tarzana Springs, because Zadok did not move his car after being notified that the parking area would be steam cleaned, and because Zadok otherwise violated the Lease by using the parking space to store an inoperable and unregistered vehicle.

On December 17, 2010, Zadok noticed that his car was missing from his assigned space. After learning from TNT that Tarzana Springs had the car towed, Zadok spoke with the property manager who purportedly told him that the towing was a mistake, and that TNT agreed to tow his car back to him. Garcia denied promising to tow the car back to Zadok, and testified that Zadok was unwilling to come to the tow yard and pay to pick up his car. As a result, Garcia contacted a company, Ritter Lien Sales, Inc., to dispose of the car through a lien sale.

On January 10, 2011, Ritter Lien Sales notified Zadok of its intent to sell the Caprice to recover a towing fee of $109.50 and storage fee of $871, unless Zadok paid those fees within two weeks. In response, Zadok signed the part of the notice stating that he contested the claim and opposed the sale. Zadok, however, did not send a copy of his opposition to the Department of Motor Vehicles as required to stop the sale. Garcia thus proceeded with the sale. At the sale, no one bid on the car, which was in such "poor shape [that] not even [Garcia's] regular junk yard guys" wanted it. Garcia eventually sold the car for $450, its "junk value." The car had no retail value.

## PROCEDURAL BACKGROUND

### A.    THE PRETRIAL PROCEEDINGS

On December 7, 2011, Zadok filed this lawsuit against Tarzana Springs, G&K, and TNT.  In the first amended complaint, he asserts claims for breach of contract, negligence, and conversion and seeks $10,000 for the Caprice and $18,046 for the tools inside it.[2]  TNT filed a cross-complaint against Tarzana Springs and G&K for indemnity and against Zadok for breach of contract.

On May 31, 2012, the court conducted a case management conference and set several dates.  The case was referred to mediation with a post-mediation conference on January 13, 2013.  A final status conference was set for May 17, 2013, and the trial was scheduled for June 3, 2013.

On May 16, 2013, the day before the final status conference, Zadok's counsel, George J. Shalhoub, filed a notice of settlement, stating that a request for dismissal would be filed within 45 days.  Because of that filing, the court vacated the previously scheduled dates, including the June trial date.  The court then set a hearing on July 16, 2013 for an "Order to Show Cause Re Dismissal" (OSC).

On June 28, 2013, Shalhoub filed a substitution of attorney, signed by Shalhoub and Zadok, indicating that Zadok would be representing himself.  Two weeks later, on July 11, 2013, Zadok filed an ex parte application seeking to continue the July 16 OSC hearing.  In his supporting declaration, he informed the court that he decided not "to settle this case for the amounts offered by the defendants" (i.e., $3,000) and that he was "now representing [himself] in this case."  He requested a continuance because he would be observing the Jewish holiday of Tisha B'Av on July 15 and July 16.  Over the objection of Tarzana Springs and G&K, the court granted the continuance until August 15, 2013.  Zadok advised the court at the July 11 hearing that Shalhoub and another attorney likely would represent him in future proceedings.

---

[2]    The only claim asserted against TNT is for conversion.

4

On August 15, 2013, the court scheduled the trial for August 22. Zadok objected. Although he appeared without counsel and had not filed another substitution form, Zadok stated that his lawyer, Shalhoub, was on vacation. Zadok also informed the court that he would need a lengthy continuance because of the upcoming holidays. He stated that he had to prepare for the Jewish New Year, Yom Kippur, and Sukkot and indicated that he would need a "minimum of two months after the holidays." The court denied Zadok's request to continue the trial. The court set the trial for August 22.

On August 22, 2013, the parties appeared for trial. The court asked for a time estimate for the trial. Zadok estimated that the trial would take less than three hours. The court then asked Zadok whether he wanted to start the trial that day or trail it to the next, because Zadok had mentioned that he needed time to prepare for the Jewish holidays. The court explained that it was trying its best to accommodate Zadok, stating: "And I want to get your case finished so that you can attend to your—I know you had some things to do on another one of the Jewish holidays . . . , and I'm trying as hard as I can so you can get all that in so you on the one hand can have your day in court and on the other hand do your religious obligation . . . ." Zadok responded: "I want to finish today. I mean this is three years already."

## B.    THE TRIAL PROCEEDINGS

The bench trial began on August 23 and continued on August 26 and 27. Because Zadok raises numerous issues not raised below, we will summarize the positions the parties presented to the trial court.

According to defendants, G&K authorized the towing when Zadok failed to move his car after being notified that the parking area had to be cleared for steam cleaning. In addition, the towing was justified because Zadok violated the terms of the Lease, which precluded him from parking an unregistered and inoperable vehicle in his assigned space. Garcia testified that the Caprice was in "very bad shape" with two flat, shredded tires that looked like they "had rotted out." In addition, the car had no battery, a missing trunk lock, a big puddle of fluid underneath it, and a lot of trash inside, including magazines, newspapers, rags, and rat feces. There were no tools or anything of value in the car.

5

After the car was towed, Zadok refused to pay the towing and storage fees, prompting TNT to initiate a lien sale. Eventually, the car was sold to a salvage yard for $450, because no one would buy it at the auction.

Zadok gave a very different version of the events. He testified that he bought the Caprice used in 1988 for $1,800 or $2,500, and that the car was a "classic" in 2010 "worth between $7,000-$12,000." "[T]he car was in . . . excellent condition" and in high demand by filmmakers and collectors. The photographs of the car being towed did not depict the condition of the car before it was towed: the car had "four new tires"— none of which was flat; and it did not have all the damage shown. The damage to his car, including the tires, was the "result of planned vandalism by [TNT]." TNT's "pictures were taken days after the actual towing and in a different place. It seems as if it was fully reenacted." Zadok did admit, though, that the car was last registered to operate on the roads in 2006.

Zadok acknowledged receiving notice of the steam cleaning, but claimed that the notice occurred months before the towing and that he moved his car as directed. Zadok argued that the towing had nothing to do with the steam cleaning or the use of his parking spot as a storage space for a dilapidated car. Rather, "this whole matter is one big conspiracy" perpetrated by individuals who "lie[d] flagrantly in court." Tarzana Springs and G&K had "stolen" his car because "they don't like [him]." "Anyone can see that this was not an innocent mistake, but rather a planned scheme to give [him] trouble." After stealing his car, defendants prevented him from getting it back as part of a "premeditated" plan that was accomplished by "excuses and lies and acting by force." Zadok likened the defendants to "thieves or terrorists" who commit "extortion." He also accused them of submitting falsified evidence to the court, claiming that the Lease addendum was "a forged document," even though he previously admitted the genuineness of the document in response to a request for admission.

Zadok claimed that defendants also stole the valuable tools inside his car. He argued that "[a]n assumption could be made that when [TNT] saw that the car was a classic and had expensive tools in it, they decided to keep it." Zadok listed more than

6

150 items that were in his car when it was towed, including but not limited to: a 60-pound jack hammer, six shovels and handles, six narrow shovels, six 2-man cross-cut saws, six picks, six garden hoes, six fork hoes with handles, six hammers, four crowbars, two chainsaws, 200 feet of water hoses, 100 copper pipe fittings, 20 copper shut-off valves, a wood planer, and tree climbing equipment with 150 feet of rope. Zadok claimed that he was entitled to $18,046 for the value of the "very expensive professional tools" and $78,500 for the loss of their use.

## C. THE TRIAL COURT'S DECISION

After hearing closing arguments, the trial court tentatively ruled in favor of defendants and subsequently issued a statement of decision consistent with its tentative ruling. The court concluded that the evidence "richly supported" the conclusion that there was no breach of the Lease, because that agreement authorized Tarzana Springs to tow Zadok's car without notice for storing in his parking space an inoperable vehicle that did not have current registration. The court also found that Zadok failed to move his car for steam cleaning after being notified to do so. When G&K had the car towed, it did so "in a reasonable, appropriate and proper manner."

The court then rejected Zadok's remaining claims. The court concluded that Zadok failed to prove any negligent conduct or conversion. In addressing the conversion claim, the court found ample evidence "that there were no tools in the subject vehicle as alleged by [Zadok]" and that the fair market value of the car when towed was no more than $450. "The car was in [an] extremely dilapidated condition," as shown in the defense photographs, and "had no value beyond that of salvage value." On the cross-complaint, the court found in favor of TNT and awarded it $2,350 for towing and storage fees.

On September 30, 2013, the trial court entered judgment. Zadok timely filed his notice of appeal on November 25, 2013.

7

## DISCUSSION

### A. THE DENIAL OF A TRIAL CONTINUANCE

Relying on *Vann v. Shilleh* (1975) 54 Cal.App.3d 192, Zadok contends that the trial court committed reversible error in denying him a continuance after his attorney allegedly abandoned him. He further contends that the trial court violated its duty to protect him from being abandoned or misled. Neither contention has merit.

#### 1. *The Trial Court Did Not Abuse Its Discretion in Denying a Continuance*

Trial continuances are "disfavored" and may be granted "only on an affirmative showing of good cause." (Cal. Rules of Court, rule 3.1332(c).) In deciding whether to grant a continuance, a trial court must consider each request "on its own merits." (*Ibid.*) In doing so, the court must consider all relevant circumstances, including "the proximity of the trial date, whether there were previous trial continuances, the length of the requested continuance, and the prejudice that parties or witnesses would suffer as a result of the continuance. [Citation.]" (*Thurman v. Bayshore Transit Management, Inc.* (2012) 203 Cal.App.4th 1112, 1126.) We will uphold the trial court's decision absent "'clear abuse . . . appearing in the record. [Citation.]'" (*Ibid.*) There was no clear abuse here.

On May 17, 2013, the trial court vacated the June trial date because Zadok filed a notice of settlement. At the next proceeding on July 11, the trial court granted Zadok's request for a continuance for religious accommodation. On August 15, the trial court set trial on August 22 over Zadok's objection. By that point, the case had been pending for more than 18 months, the prior trial date had been vacated because of the settlement notification, and Zadok had almost two months to obtain new counsel or to prepare for trial of a case that he described as a "simple" one that would take less than three hours to try. Under these circumstances, the trial court's decision to deny a lengthy continuance request was not an abuse of discretion.

Moreover, Zadok was sending mixed signals that reasonably caused the trial court to be skeptical about his intentions. As the trial court observed, Zadok complained that it took too long to get to trial and "criticized . . . the court system and the lawyer on the other side because of the consumption of time." Yet Zadok repeatedly asked for

8

continuances to observe the Jewish holidays.  The court granted one request on July 11, and then Zadok requested several more months when he appeared before the court on August 15.  When the trial court told Zadok that he was "pulling in all directions at once" and taking "inconsistent positions," Zadok responded that the court was "a hundred percent right."[3]

Zadok's reliance on *Vann*—which he claims is "on all fours" with his case—is misplaced.  There the trial court refused to continue the trial after granting defense counsel's motion to withdraw from the case on the Friday before the Monday set for trial.  On Friday, the trial court permitted the attorney to withdraw because the defendant was dilatory in withdrawing from a settlement agreement.  (*Vann v. Shilleh*, *supra*, 54 Cal.App.3d at p. 195.)  On Monday, the trial court rejected both parties' request for a continuance.  The trial court refused to continue the case because it "'operates under the policy of no continuance'" to avoid having its calendar become a "'horrible mess.'"  (*Id.* at pp. 195-196.)  The court explained that its calendar was "'in excellent condition due to the fact that [it has taken] a hard line on these continuances.'"  (*Id.* at p. 196.)

In reversing, the court concluded that the trial judge did not exercise informed judgment, but instead denied the continuance "based solely on a policy against continuances, without considering whether the case before it justified a departure from

---

[3]    The court had this colloquy on the first day of trial on August 23, 2013, after concluding the Friday session early to accommodate Zadok's religious observance. When the court ordered the parties to return on Monday, Zadok stated:  "I cannot come, your Honor.  Try to understand me.  This is a very, very tremendous religious holiday." This prompted the court to review the procedural history of the case which showed that Zadok continued to make conflicting demands.  As the trial court summarized:  "[O]n the one hand you want to have the case dealt with rapidly.  On the other hand you cause delays by stating through your attorney that the case has been settled.  [Then] you want me to postpone a hearing on an order to show cause.  [Next,] you want me to get along with it because you are dissatisfied with the extended life of the case.  Then you say I'll finish [the trial] in one hour.  Then you don't finish in one hour. . . .  Then you say you want to stop at 3:30 [on Friday].  I say all right.  Then you say . . . I can't come here on Monday on the 26th."

that salutary policy." (*Id*. at p. 199.) While a party is not entitled to a continuance as a matter of right when it seeks to change counsel on the eve of trial, "a necessary substitution of counsel just prior to trial may justify the granting of a continuance, in some cases." (*Id*. at p. 196.) The court also faulted defense counsel for acting unethically by withdrawing "on the very eve of trial" because he was "irked to see a settlement that he had negotiated fail of consummation." (*Id*. at p. 197.) Though aware of these facts, the trial judge did nothing to protect the defendant from his counsel's "improper abandonment" but instead granted counsel's motion to withdraw. (*Ibid*.)

The facts of this case are distinguishable. The trial court did not deny the trial continuance in adherence to a policy, but rather based its decision on an assessment of the facts—which differ markedly from those in *Vann*. Here, the trial court did not grant Zadok's counsel's motion to withdraw right before trial and then deny a continuance request. In fact, there was no motion to withdraw, as Zadok consented to the substitution; and the substitution was not filed on the eve of trial, but almost two months prior. Zadok therefore had almost two months to find counsel or prepare for trial himself.

We also reject Zadok's argument that the trial court abused its discretion by denying a continuance based upon a misperception of the facts and the law. He claims that the trial court factually erred in denying the continuance based on its erroneous belief that "everything had already been scheduled with the jury." This statement comes from Zadok's declaration that became the settled statement for the August 15, 2013 hearing. In that declaration, Zadok acknowledged that the court used "terminology [he] did not understand, and the clerk handed out some documents." The clerk handed out the trial order entitled: "Order Re Non-Jury Trial Setting and Trial Preparation; Advisement Re Pro. Per. Status." It is clear from that "non-jury trial" order that the court knew that it was a non-jury trial.

Zadok next claims that the trial court legally erred in denying the continuance based on its erroneous "belief that a party's religious constraints were not grounds for a continuance." Zadok cites the principle that "[t]he matters germane to the court's ruling [on a motion for a continuance] range all the way from the health of witnesses to the true

10

significance of religious holidays." (*Friedman v. Knecht* (1967) 248 Cal.App.2d 455, 461.) He then seizes on the trial court's statements that "observance of the Jewish holidays . . . is not a basis under law for postponement of any proceedings," and that it was "not required to accommodate any of them as a matter of law."

Zadok reads too much into these statements. Based on the trial court's actions, it was clearly aware of its ability to consider a party's religious obligations in deciding whether to grant a continuance. The trial court "recognize[d] that [Zadok's observance of the Jewish holidays] is important" and accommodated Zadok's requests on those very grounds, continuing the July 16 hearing for Tisha B'Av, avoiding scheduling the trial during the Jewish holidays, and ending trial early for the Sabbath. We cannot say that the trial court abused its discretion in refusing to postpone a short and simple trial for several months to allow Zadok to prepare for the Jewish holidays.

2. *The Trial Court Did Not Violate Any Duty to Protect Zadok*

Zadok next argues that the trial court failed to protect him from being abandoned by his counsel and being misled.

In advancing this argument, Zadok relies on a general statement about a trial court's obligation "to see that a miscarriage of justice does not occur through inadvertence" on the part of a self-represented litigant. (*Taylor v. Bell* (1971) 21 Cal.App.3d 1002, 1008.) The *Taylor* court went on to explain, however, that despite this general duty, a trial court "is not required to act as counsel for that party." (*Id*. at p. 1008.) "A trial judge presiding over a case initiated by [a] . . . self-represented plaintiff . . . faces a significant challenge in balancing his or her obligations to facilitate the ability of the self-represented litigant to be fairly heard, on the one hand, and to refrain from assuming the role of advocate, on the other. Canon 3B(8) of the California Code of Judicial Ethics requires a judge to 'dispose of all judicial matters fairly, promptly, and efficiently' and to 'manage the courtroom in a manner that provides all litigants the opportunity to have their matters fairly adjudicated in accordance with the law.' The Advisory Committee Commentary to this canon provides, in part, 'The obligation of a judge to dispose of matters promptly and efficiently must not take precedence over the

11

judge's obligation to dispose of the matters fairly and with patience. For example, when a litigant is self-represented, a judge has the discretion to take reasonable steps, appropriate under the circumstances and consistent with the law and the canons, to enable the litigant to be heard.' (See ABA Model Code of Jud. Conduct, canon 2, rule 2.2, com. [4] ['[i]t is not a violation of the Rule [regarding impartiality and fairness] for a judge to make reasonable accommodations to ensure pro se litigants the opportunity to have their matters fairly heard'].) The canons and commentary thus provide a path to ensure a self-represented litigant can be fairly heard on the merits while the court maintains its impartiality and does not assume (or appear to assume) the role of advocate or partisan. (See Cal. Code Jud. Ethics, canon 3 ['[a] judge shall perform the duties of judicial office impartially, competently, and diligently'].)" (*Holloway v. Quetel* (2015) 242 Cal.App.4th 1425, 1433-1434.) The court did not violate its obligations here.

First, Zadok claims that the trial court failed to protect him from being misled about whether he would be representing himself beyond the ex parte hearing on July 11, 2013, when he sought and obtained a continuance. At that hearing, Zadok stated that he did not believe he could represent himself because he is not an attorney and does not speak English well, and that Shalhoub and another attorney "[m]ost likely" would represent him. Zadok claims that the trial court had a duty, in light of this statement, to explore the "obvious discrepancy between [his] solo appearance in court and his oral comments . . . that he was not acting as his own counsel. . . . A few questions from the judge would have revealed an improper abandonment by [his] trial counsel."

We fail to see an "obvious discrepancy" that required further inquiry to avoid a miscarriage of justice. Zadok informed the court that he did not intend to represent himself in the future, but instead expected that Shalhoub and another attorney "[m]ost likely" would represent him. This expression of future expectation is hardly inconsistent with his self-represented status at the hearing. Zadok did not say anything to suggest that he believed that Shalhoub was still representing him other than for this one hearing. On the contrary, he expressed a likelihood—not a certainty—of future representation. The trial court was not obligated to inquire further in these circumstances.

12

Second, Zadok contends that the Judicial Council's substitution of attorney form is so confusing that it deprived him of his right to a fair trial by failing to protect him from being inadvertently misled. The form purportedly misled him to believe that the substitution was for the July 11 hearing only, because it did not disclose that the substitution was permanent.

The Judicial Council form is not confusing. There is nothing in the form—or in the concept of "substitution of attorney"—that suggests anything other than permanency. Indeed, the form refers to "former" and "new" legal representatives, terms that convey a more permanent status. The form that Zadok signed lists Shalhoub as his "[f]ormer legal representative" and identifies himself as his "[n]ew legal representative." Nor is there anything in the record suggesting that Zadok was genuinely confused. In his declaration for the July 11th hearing, he made clear that he was representing himself in the case (and not simply for a single proceeding): "I . . . filed a substitution of attorney form with the court. I am now representing myself in this case." And when asked about self-representation at the hearing, Zadok did not say that Shalhoub was still his lawyer but only that he likely would be in the future. On this record, we cannot find that Zadok was misled.[4]

Third, Zadok asserts that the duty to protect self-represented litigants from being misled required the trial court to timely advise him that he would be treated just like an attorney. Assuming that such an advisal is required in civil cases, the trial court advised Zadok about self-representation at the August 15, 2013 hearing in preparation for trial.

---

[4] The record would appear to support a finding of manipulation rather than confusion. Zadok offered conflicting information about his intentions. Although he consented to Shalhoub's withdrawal from the case, he requested a trial continuance in part because "[his] attorney," Shalhoub, was on vacation. Yet Shalhoub had not substituted back into the case or provided notice of any intent to do so. Then after the court denied the lengthy continuance request for religious preparations, Zadok sought more time to find another lawyer—despite having claimed that Shalhoub was representing him and would soon return from vacation. As the trial court would later observe, Zadok appeared to be "pulling in all directions at once."

13

This was the next appearance after the July 11 proceeding when he first appeared representing himself. We cannot say the advisement was untimely, and Zadok has not shown that any delay was prejudicial. (*Jade Fashion & Co., Inc. v. Harkham Industries, Inc.* (2014) 229 Cal.App.4th 635, 655 [no reversal absent showing of prejudice].)

## B. THE INTERPRETATION OF THE LEASE

The Lease authorizes the towing of any "improperly parked" vehicle without notice. Zadok contends that his car was not "improperly parked" as described in the Lease.

In construing a contract, a court must determine the mutual intent of the parties at the time of contracting, using an objective standard. (Civ. Code, § 1636; see *Ramos v. Westlake Services LLC* (2015) 242 Cal.App.4th 674, 685.) Where, as here, "a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." (Civ. Code, § 1639; see also *id.* at § 1638 ["The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."].) A court need not look beyond the written instrument if the contract language is clear and contains no patent or latent ambiguity. (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391.) While a court should consider competent extrinsic evidence to determine the existence of any latent ambiguity, extrinsic evidence that contradicts the express terms of a written contract should be disregarded. (*Wagner v. Columbia Pictures Industries, Inc.* (2007) 146 Cal.App.4th 586, 592.)

Paragraph 2 of the Lease addendum provides: "A current vehicle registration, in the name of the Lessee, is required for any vehicle using the assigned parking space. [¶] . . . [¶] Lessee acknowledges enforcement of these rules is by towing, and storage. [¶] Vehicles improperly parked on the property (with or without a valid permit) will be towed immediately without prior warning notice. [¶] . . . [¶] If the registered owner does not timely claim the vehicle, it may be sold pursuant to California State lien sale laws. [¶] Vehicle owner(s) are responsible for the cost of towing, storage, and lien sale fees, and will hold the property owner, employees and authorized towing company

14

harmless from same." Paragraph 2 then lists nine restrictions described in the following lettered subparagraphs:

(a) "[v]isitor designated parking spaces are reserved for visitors";

(b) "[l]essee is not allowed to park in visitor, future resident, office, employee or other restricted areas or spaces";

(c) "[v]ehicle (including motorcycles) repairs may not be performed on premises" and "[f]lat tires must be repaired within 24 hours";

(d) "[v]ehicle washing is not permitted on the premises at any time";

(e) "[v]ehicles may not be double parked, parked in non-approved areas or fire lanes";

(f) "[v]ehicle displaying expired, forged, invalid or voided permit is not allowed to park on the property";

(g) "[n]o trailer, boat, or vehicle other that [*sic*] passenger cars or motorcycles may be parked in the parking areas without the written consent of management";

(h) "[v]ehicles are to be parked 'Head-in' only"; and

(i) "[s]peed limit within the community is 5 mph or less."

Zadok argues that a vehicle is "improperly parked" only if it falls with the "five instances of improper parking" contained within subparagraphs (a), (b), (e), (g), and (h). He relies on the principle of *ejusdem generis*, which provides that "where specific words follow general words in a contract, 'the general words are construed to embrace only things similar in nature to those enumerated by the specific words.' [Citations.]" (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1045, fn. omitted.) But even if we were to interpret paragraph 2 as containing an exhaustive list of towing violations, Zadok would still not prevail. The Caprice was "improperly parked" within the meaning of that paragraph because it violated the first provision of paragraph 2 that "[a] current vehicle registration, in the name of the Lessee, is required for any vehicle using the assigned parking space." This requirement is consistent with the admonition

15

elsewhere in the Lease that "[p]arking spaces . . . are for operable vehicles only, not for storage of personal property."

Moreover, Zadok's argument does not address a separate ground for the trial court's finding against him. The trial court also concluded that the Caprice could be towed because Zadok did not move it after being notified that the parking area would be steam cleaned. Paragraph 4 of the Lease addendum provides that "[v]ehicles may be towed pursuant to prior warning notice by management for construction or maintenance affecting structures, carport, and parking or driveway areas." The trial court found that G&K notified Zadok that he had to move the Caprice so that it could clean the parking area, and that Zadok failed to do so. Under the Lease, G&K could have the car towed in this circumstance.[5]

## C. THE COURT'S EVIDENTIARY RULINGS

Zadok challenges a number of the trial court's evidentiary rulings. None of the challenges has merit.

### 1. *Exclusion of the Original Lease*

Zadok contends that the trial court incorrectly excluded the introduction of the original lease agreement between the parties (i.e., the 1994 lease). Because Zadok never properly moved to admit the original lease, the contention is meritless.

Before a trial court can be said to have excluded evidence, a party must first move for its admission. (*People v. Thuss* (2003) 107 Cal.App.4th 221, 233.) Zadok did not do so here. Recognizing this omission, Zadok suggests that he tried to introduce the document, but the trial court prevented him from doing so. This suggestion is based on a distorted reading of the record and a misunderstanding of the rules of evidence. Zadok points to his response to a question on direct examination in the defense case, where he

---

[5]   Our conclusion that the Caprice was towed lawfully under the express provisions of the Lease disposes of Zadok's arguments that Tarzana Springs violated an implied contractual duty to inquire whether Zadok intended to abandon the car before towing it and that Tarzana Springs acted negligently in failing to make such an inquiry.

was being asked about the Lease and responded that he was "not interested" in that document or in G&K's "tricks" and instead wanted to discuss the original lease. Of course, Zadok had no right to ignore the questions asked and to introduce evidence during defense counsel's examination of him. The trial court's ruling, striking Zadok's response as nonresponsive, was correct.[6] (Evid. Code, § 766; *Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1518.)

If Zadok wished to introduce the original lease, he should have attempted to do so when he testified in his case, or during his examination of a witness who could properly introduce the evidence in the defense case. It is not enough to bring the "original lease to the trial court's attention" while being examined by his adversary or to present the original lease as part of a packet of documents for "the trial judge [to] review" before trial.[7] Having failed to properly introduce this evidence, there is no adverse ruling for us to review. (*People v. Thuss*, *supra*, 107 Cal.App.4th at p. 233 ["Because defendant's trial counsel never offered the [documents] in evidence, and received no ruling on their admissibility, there is no ruling for this court to review, and defendant's contention of error may not be sustained."].)

2. *Failure to Rule on the Admissibility of the Tool Receipts*

Zadok next argues that the trial court committed prejudicial error by not ruling on the admissibility of receipts for the tools he claimed were stolen from his car. He claims that he presented these receipts in the same "packet of evidence" that contained the original lease, and that the trial court implied that it would rule on them. As discussed above, this is not a proper way to introduce evidence. Indeed, the court could not have admitted the evidence without testimony, or a stipulation, that provided an adequate

---

[6] Zadok's testimony was frequently nonresponsive and argumentative, causing the court to grant numerous motions to strike.

[7] While the trial court could have inquired as to Zadok's intentions, or clarified the necessary procedures, under the circumstances presented in this case we see no abuse of discretion in failing to do so.

17

foundation. (See, e.g., Evid. Code, § 1401 [authentication required].) Zadok had every opportunity to submit the receipts during his testimony in his case and cannot blame the trial court for his omission.

   3.     *Admission of the Carfax Printout*

The trial court found that the Caprice was worth no more than $450 on the day it was towed. Zadok contends that there was insufficient evidence to support that valuation because the trial court improperly relied on an inadmissible printout from Carfax.com. Zadok has forfeited any challenge to the admission of this evidence by failing to object in the trial court. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1214.) Moreover, the Carfax.com printout was not the only evidence supporting the $450 valuation. Garcia testified that he delivered the Caprice to a wrecking yard and received $450 for it after unsuccessfully attempting to sell it in an auction. Thus, the trial court's finding is amply supported.

   D.     **THE ISSUES RAISED FOR THE FIRST TIME ON APPEAL**[8]

Zadok raises numerous issues on appeal that were not presented to the trial court. It is well established that an appellate court generally will not review such issues. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) This rule encourages the parties to give the trial court an opportunity to correct any errors, thus serving the fundamental goals of judicial economy, party fairness, and appellate review of a developed record. (*Ibid*.) To accomplish these objectives a party must raise the issue before the trial court and must do so in more than a cursory or "'passing'" fashion. (*Schultz v. Workers' Comp. Appeals Bd.* (2015) 232 Cal.App.4th 1126, 1134.) The issue must be actually litigated in the trial

---

[8]     In addition to raising issues for the first time on appeal, Zadok seeks to introduce evidence for the first time on appeal. He argues that TNT alleged in its cross-complaint that Zadok refused to pay towing and storage fees for his car and "'the contents therein.'" This purportedly is a "momentous" judicial admission that supports his conversion claim because the "'contents'" obviously referred to his valuable tools, contrary to Garcia's testimony at trial that there were no tools inside. We are not at liberty to consider, or weigh the impact of, new evidence on appeal. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 472.)

18

court.  (*Natkin v. California Unemployment Ins. Appeals Bd.* (2013) 219 Cal.App.4th 997, 1011.)  While "the forfeiture rule is not automatic," the California Supreme Court has cautioned that an "appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue."  (*In re S.B.*, *supra*, at p. 1293.)

We apply the forfeiture rule to, and decline to consider the merits of, the following issues:

1. Whether the Lease violated the Los Angeles City rent control ordinance (L.A. Mun. Code, § 151.09(A)(2)(c)) because Zadok did not "knowingly consent, without threat or coercion, to each change in the terms of the tenancy" (*ibid.*);[9]

2. Whether the Lease was unenforceable for lack of consideration;

3. Whether Tarzana Springs and G & K waived the right to tow the Caprice for failing to have current registration "[b]y ignoring the issue for years"; and

4. Whether Zadok's objection to the sale of his car in compliance with applicable law (i.e., Veh. Code, § 22851.8) precluded a finding that defendants acted properly and that he failed to mitigate damages.

The parties filed a joint statement of the issues to be determined at trial, and Zadok filed a detailed trial brief.  None of the above issues was raised in these filings or at trial. We therefore will not consider them for the first time on appeal.

### E.    THE JUDGMENT ON TNT'S CROSS-COMPLAINT

The trial court found Zadok liable under TNT's cross-complaint for towing and storage fees in the amount of $2,350.  Zadok contends that this finding was erroneous

---

[9]    While Zadok gave testimony that he did not agree to the change in lease terms, he did not allege in his first amended complaint that the Lease violated the rent control ordinance, he did not raise that theory in any detail at trial, and he did not introduce any evidence of the changes made to that lease.  On appeal, he asserts without any record support that the parking provisions in the Lease are "new."

because TNT did not have counsel at trial and thus could not obtain affirmative relief. Zadok also contends that the evidence would not support an award of damages under a breach of contract theory, even if TNT were eligible to seek relief. We agree that the judgment against Zadok on the cross-complaint cannot stand.

Before trial, counsel for TNT substituted out of the case with the consent of Garcia. When Garcia attempted to examine a witness at trial, the court precluded him from doing so because Garcia, a non-attorney, could not represent the company. This ruling was correct because "a corporation cannot represent itself in a court of record either in propria persona or through an officer or agent who is not an attorney." (*Caressa Camille, Inc. v. Alcoholic Beverage Control Appeals Bd.* (2002) 99 Cal.App.4th 1094, 1101.) While recognizing this prohibition, the trial court incorrectly awarded damages to TNT—a corporation that did not appear at trial. (*Merco Constr. Engineers, Inc. v. Municipal Court* (1978) 21 Cal.3d 724, 730 ["To presume . . . that a corporation can act without representation, is a fiction we cannot accept."]; see *Van Gundy v. Camelot Resorts, Inc.* (1983) 152 Cal.App.3d Supp. 29, 32 [holding that a court should either continue the case for a corporation to obtain counsel or enter a default against the corporation for nonappearance].)

We therefore reverse the award of damages in favor of TNT on the grounds that this corporate party failed to appear at trial.[10]

---

[10] Although we reverse the grant of affirmative relief, we do not disturb the trial court's finding in favor of all defendants, including TNT, on the conversion claim. Zadok has not raised this issue on appeal. In any event, the trial court found that there were no tools in the car when it was towed, and thus Zadok could not prove any loss.

20

## DISPOSITION

The judgment in affirmed in part and reversed in part. The trial court is directed to enter judgment for Zadok on the cross-complaint. Tarzana Springs and G&K are to recover their costs on appeal.

BLUMENFELD, J.[*]

We concur:

ZELON, Acting P. J.

SEGAL, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.